```
                                                    USDC SDNY
                                                    DOCUMENT
UNITED STATES DISTRICT COURT                        ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK                       DOC#_____
------------------------------------------------------------x   DATE FILED: 1/24/14
```

SUMMIT HEALTH, INC.,

                    Plaintiff,

      - against -

APS HEALTHCARE BETHESDA, INC.,

                  Defendant.

------------------------------------------------------------x

**<u>OPINION AND ORDER</u>**

11-cv-9718 (ER) (LMS)

<u>Ramos, D.J.:</u>

Summit Health, Inc. ("Plaintiff" or "Summit") brought this breach of contract action against APS Healthcare Bethesda, Inc. ("Defendant" or "APS"), alleging that APS failed to pay the full amount due under their service contract. Doc. 1. Summit alleges that APS has wrongfully withheld payment of almost two-and-a-quarter million dollars' worth of minimum fees. *See* Compl. ¶¶ 35-36. The underlying controversy revolves around the meaning of the phrase "Customer projection," which appears in one of the contract's minimum fee provisions. APS disputes Summit's reading of the contract and points out that, if awarded, the minimum fees alone would more than double the amount Summit earned for services actually performed. *See* Def.'s Mem. of Law in Supp. (Amend) at 31.[1]

Plaintiff moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 38. In addition to opposing the summary judgment motion, Defendant has filed a motion for leave to file an amended answer and counterclaim, pursuant to Federal Rules of Civil Procedure 15 and 16. Doc. 42.

---

[1] For ease of reference, citations to the parties' briefs and supporting papers will include parenthetical notations indicating whether a given document relates to Plaintiff's motion for summary judgment ("MSJ") or Defendant's motion for leave to file an amended answer and counterclaim ("Amend").

For the reasons discussed below, Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Defendant's motion for leave to file an amended answer and counterclaim is DENIED.

## I.      Factual Background

The following facts are undisputed except where otherwise noted.

Summit is a Michigan corporation that develops healthcare programs for businesses and health plans.  Compl. ¶ 3.  Its programs offer preventative care services, including health screenings, at employees' and plan members' worksites.  *Id.*  Its chief executive officer is Richard Pennington, and its chief operating officer is Douglas Finch.  Decl. of Richard Penington (MSJ) ¶ 1; Decl. of Douglas C. Finch (MSJ) ¶ 1.  Jason Moczul, the national account manager assigned to the program at issue in this case, was APS's primary contact at Summit with respect to operational matters.  Decl. of Jason Moczul (MSJ) ¶¶ 1-2.

APS, an Iowa corporation with its principal place of business in White Plains, New York, administers state and local government health plans and provides healthcare services to government employees.  Compl. ¶ 4; Answer ¶ 4.  During the time period at issue in this case, its president and chief operating officer was Jerome Vaccaro, its chief financial officer was John McDonough, and the in-house attorney who served as the "point man" in negotiations with Summit was Paul Dominianni.  Decl. of Jeff E. Butler (MSJ) Ex. 27, at 6:5-6, 71:18-72:14; *id.* Ex. 29, at 19:12-15.  David Glazer, a senior vice president in White Plains who was responsible for operations in the eastern United States, oversaw a team of employees based in Tennessee.  *Id.* Ex. 26, at 6:21-7:2, 12:7-12; *id.* Ex. 27, at 10:13-15, 11:3-5.  That team included an executive director, Jim Shulman, who reported to Glazer; a director of operations, Bob Hines, who reported

to Shulman; and a clinical supervisor, Troy Watson, who reported to Hines.  *Id.* Ex. 26, at 11:20-12:12.

Summit and APS were parties to the Summit Health Services Agreement (the "Agreement"), which was effective as of January 1, 2011.  Pl.'s 56.1 Stmt. ¶ 3; Def.'s 56.1 Stmt. ¶ 3.[2]  The Agreement was a subcontract.  APS was also party to a general contract with the State of Tennessee, wherein APS agreed to provide health care services to state employees who had enrolled in the state's "ParTNers for Health" program.  Pl.'s 56.1 Stmt. ¶ 12; Def.'s 56.1 Stmt. ¶ 12.  This contract paid APS a fixed fee per screening performed, and it exposed APS to liquidated damages based on various performance metrics, including maintenance of a fully operational website.  Decl. of Jeff E. Butler (MSJ) Ex. 1, at APS 14994, 15009-15012.

Under the Agreement, Summit agreed to provide staffing and supplies for health screening clinics at Tennessee worksites during the first six months of 2011.  Pl.'s 56.1 Stmt. ¶ 4; Def.'s 56.1 Stmt. ¶ 4.  Summit's contractual duties included registering participants, scheduling appointments, and setting up the clinics.  Agreement at 11.[3]  Participating state employees could sign up online or by phone in advance of each clinic.  *Id.*  Summit maintained an online appointment system that state employees could use for this purpose.  Pl.'s 56.1 Stmt. ¶ 15; Def.'s 56.1 Stmt. ¶ 15.  In addition, Summit was required to accept "walk-in appointments" to the extent it could accommodate them and subject to an agreed-upon policy.  Agreement at 11.

---

[2] Citations to "Pl.'s 56.1 Stmt." refer to Plaintiff's Local Civil Rule 56.1 Statement, Doc. 47.  Citations to "Def.'s 56.1 Stmt." refer to Defendant's Local Civil Rule 56.1 Statement, Doc. 55.

[3] A copy of the Agreement is included as Exhibit 1 to the Declaration of Douglas C. Finch in support of Plaintiff's summary judgment motion.  Doc. 40.  Citations to the Agreement refer to the original pagination as it appears on the bottom center of each page.

The pricing terms were set forth in Exhibit B to the Agreement.  *Id.* at 3, 17-20.  The terms included a $37 fee for each screening Summit performed.  *Id.* at 17.  That price was the product of negotiations between the parties.  *See* Decl. of Richard Penington (MSJ) ¶ 10.  Exhibit B also included various fees, including a "standard minimum" for "health screening clinics" that was described as follows:  "40 screenings, or 90% of Customer projection, whichever is greater."  Agreement at 17.  This per-clinic minimum fee provision is the subject of the present dispute.  The provision appeared in all drafts of Exhibit B that the parties exchanged.  Pl.'s 56.1 Stmt. ¶ 8; Def.'s 56.1 Stmt. ¶ 8.

On December 21, 2010, Dominianni sent Finch an email in which he referenced the parties' earlier agreement to reduce the per-screening rate to $37 and informed Finch that all other provisions of Exhibit B were "acceptable to APS."  Decl. of Douglas C. Finch (MSJ) Ex. 5.  Summit began performing under the Agreement in January 2011, although the Agreement was not actually signed until March 15, 2011.  Pl.'s 56.1 Stmt. ¶¶ 20, 23; Def.'s 56.1 Stmt. ¶¶ 20, 23.

At Summit's request, Watson and his team began providing Summit with clinic-by-clinic participation estimates (the "Watson estimates").  *See* Decl. of Troy Watson (MSJ) ¶¶ 5, 10; *id.* Ex. C.  Glazer testified at his deposition that he knew the Watson estimates were being provided but that he believed they would be used solely for staffing (and not for billing) purposes.  Decl. of Jeff Butler (MSJ) Ex. 26, at 114:19-116:2, 117:2-117:6.  Watson testified that he typically tried to provide an estimate at least two weeks prior to a given clinic.  *Id.* Ex. 30, at 115:20-116:10.  He expected that Summit would staff and supply the clinics based on those estimates.  *Id.* Ex. 30, at 78:25-79:4, 169:7-9.  Both he and Glazer provided deposition testimony indicating that Watson's figures represented good-faith estimates of expected clinic participation.  Decl. of Jeff Butler (MSJ) Ex. 26, at 130:23-131:15, 170:23-171:6; *id.* Ex. 30, at 76:9-15.  However,

4

Watson repeatedly indicated to Summit that the numbers he was providing were "guesses." *See, e.g.*, Decl. of Troy Watson (MSJ) Ex. E-F.

The accuracy of the Watson estimates, as that issue pertained to the minimum fee provision, arose in a January 18, 2011 internal Summit email exchange between Finch and Moczul. Decl. of Howard S. Wolfson (MSJ) Ex. P, at SUM 10973-74. Penington was copied on the emails. *Id.* In the process of deciding that Summit would absorb the cost of providing additional privacy screens, Finch pointed out that "the clinic minimums are attractive (40 and 90%)." *Id.* Moczul responded as follows:

> I will go ahead and order another 30 [privacy screens]. That will be awesome to get 90%. We may have to talk about a gameplan of ensuring that the APS crew we talk to each week is aware of this because I wouldn't want them to be surprised with that first invoice. Just to give you an idea, the average estimate over the first two weeks has been 320 and our average screen/clinic is more like 70.

*Id.* Ex. P at SUM 10973. At his deposition, Moczul testified that he did not recall having any follow-up discussions about the issues raised in these emails, nor did he recall informing Watson that the estimates would be used for billing purposes. *Id.* Ex. D, at 33:7-12, 211:19-212:3. Penington and Finch similarly could not recall subsequent discussions concerning Moczul's email. Decl. of Howard S. Wolfson (Amend) Ex. M, at 207:5-208:23; *id.* Ex. T, at 296:10-17. Moczul prepared an initial invoice for January 2011 in February of that year, but he informed Penington and Finch that he would hold off on sending it until the Agreement was signed. Decl. of Howard S. Wolfson (MSJ) Ex. R, S.

The parties dispute whether—and to what extent—Summit actually relied on the Watson estimates in preparing for clinics. The record contains emails from Moczul that suggest that, at a

minimum, Summit relied on the online appointment system in making last-minute staffing adjustments for some of the clinics.  *See id.* Ex. L.  Moczul concedes that, when inputting participation estimates into Summit's proprietary "APEX" computer system, it was "common practice" for Summit to use numbers lower than those provided by their customers.  Decl. of Jason Moczul (MSJ) ¶¶ 19-21.

In early 2011, still prior to the execution of the Agreement, there were a number of performance issues with the online appointment system, including a glitch that allowed a limited number of participants to see other participants' appointments.  Decl. of Richard Penington (MSJ) ¶¶ 13-14.  To remedy the privacy issue, the system had to be shut down for over two weeks in March.  *Id.*  ¶ 14.  On March 8, Vaccaro alerted Penington to additional complaints about Summit's performance.  *Id.* ¶ 15.  These complaints included issues with the level of staffing being provided, allegations that staff members were inadequately trained, and reports of equipment malfunctions.  *Id.*

Also around that time, Summit realized that screening results, which included confidential patient information, were being provided to APS without a Business Associate Agreement ("BAA") in place, exposing Summit to potential HIPPA liability. *Id.* ¶ 16; Decl. of Douglas C. Finch (MSJ) ¶¶ 6, 31-32.  Rather than executing a stand-alone BAA, the parties had included the document as Exhibit C to the Agreement, which at that point still remained unsigned.  Decl. of Douglas C. Finch (MSJ) ¶ 31; *see* Agreement at 21-30.  Summit therefore suspended the electronic data feed that was transmitting the results to APS.  Decl. of Douglas C. Finch (MSJ) ¶ 32; Decl. of Richard Penington (MSJ) ¶ 16.  APS asked Summit to sign a stand-alone BAA at that point, but Finch informed APS on March 10 that Summit would only sign the BAA "in conjunction with a signed contract."  Decl. of Douglas C. Finch (MSJ) ¶ 33; *id.* Ex. 11.

6

This appears to have accelerated any remaining negotiations, and the Agreement was signed five days later. Finch and McDonough were the signatories for their respective companies. Agreement at 8.

Finch and Glazer met in White Plains on March 17, 2011, two days after the Agreement was signed. Decl. of Douglas C. Finch (MSJ) ¶ 40. It was during this conversation that the minimum fee issue came to the fore, with Finch informing Glazer that the Watson estimates resulted in large minimum fees for January and February. *Id.* ¶ 41; Decl. of Jeff E. Butler (MSJ) Ex. 26, at 113:6-116:2. Glazer emailed Finch on March 18, copying Shulman and Hines. Decl. of Douglas C. Finch (MSJ) Ex. 16. In the email, Glazer noted that the Tennessee staff had not been aware of the minimum fee provision because the Agreement "had never been completed in during [sic] those early months." *Id.* He then referenced the staffing issues at the clinics, along with weather-related reductions in expected turnout, before writing:

> Given all of these circumstances, we would expect that as a partner in this contract you would be billing us in January for the screenings with a minimum of 40 as a standard. We would not expect you to invoke the section of the contract that talks about 90% of projections.
>
> I have instructed the local TN team to review their projections immediately and revise the way they calculate these and to inform you today on new estimates for each site so that you can have an accurate estimate of how you should staff these screenings.

*Id.*

Hines sent Finch a follow-up email later that day, copying Glazer and Shulman (the "Hines email"). The Hines email read:

> We just reviewed David Glazer's email regarding the methodology for determining screener staffing. It appears that you have been basing your staffing on the number of folks that are signing up (and the number of slots) on your registration sheet. You sent a staffing sheet to [Watson] this month for his review and approval. We would suggest that you continue that method of review (relying

on sign-ups on the registration sheets) along with the monthly review with [Watson].

[Glazer] is correct in his assessment that we all shot high back in December.  We realized during January that the sites were not being fully utilized.  We adjusted as did you, considering the amount of staff you have been sending to each site since mid January.  Once the screenings were well under way, it was clear that neither one of us was using December "estimates".

Although it is sometimes difficult to predict how many folks may be necessary (an example being this morning's back-ups), we believe that using the sign-up sheets as a guide is the best way to determine how many screeners you need.  It looks like you have been doing that all along anyway.  If you are still using any of the estimates, you should, effective immediately, stop and continue to utilize the sign up sheets (along with [Watson]'s review) as your guide.

*Id.* Ex. 17.

As the program progressed, Summit continued to request participation estimates from Watson and his team, indicating that additional clinics could not be added to APEX without that data.  *See* Decl. of Howard S. Wolfson (MSJ) Ex. PP.  Watson thus began providing uniform estimates of either 75 or, if the clinic was being held in a large city, 100.  Decl. of Troy Watson (MSJ) ¶ 21; *see* Decl. of Jeff Butler (MSJ) Ex. 21, at APS 9186.

Summit sent APS its first invoice, covering the screenings performed in January, on March 30, 2011.  Pl.'s 56.1 Stmt. ¶ 24; Def.'s 56.1 Stmt. ¶ 24.  In the cover email accompanying that invoice, Finch described some "accommodations" that Summit made in light of APS's concerns.  Decl. of Douglas C. Finch (MSJ) Ex. 24.  The "accommodations" included an "Alternative Minimum Calculation" whereby minimum fees were calculated based on an estimate of actual screening capacity rather than on the Watson estimates.  *Id.*  The February invoice was similarly discounted based on the "Alternative Minimum Calculation."  *Id.* ¶ 48; *see* Decl. of John McDonough (MSJ) Ex. F.  As will be discussed below, the parties disagree as to

8

whether the so-called "accommodations" represented an offer to compromise or whether they constituted a waiver of the fees Summit otherwise would have charged.

APS ultimately received six invoices, one for each month of the program.  Decl. of Douglas C. Finch (MSJ) Ex. 18-23.  Beginning with a May 18, 2011 payment for the January screenings, APS made a payment with respect to each invoice.  Pl.'s 56.1 Stmt. ¶ 28; Def.'s 56.1 Stmt. ¶ 28.  These payments totaled $1,959,392.78 and consisted of a $37 payment for each screening actually performed, along with various fees and expenses due under Exhibit B of the Agreement.  Pl.'s 56.1 Stmt. ¶ 30; Def.'s 56.1 Stmt. ¶ 30.  The only amounts withheld were those attributable to the disputed standard minimum fees.  *See* Decl. of Douglas C. Finch (MSJ) Ex. 25-30.  In the cover letter accompanying the payment for January, McDonough wrote that the online appointments were "the proper measurement of a true 'Customer projection' as intended under Exhibit B."  *Id.* Ex. 25.  No payments were withheld based on purported failures by Summit to perform under the Agreement, and, pursuant to its contract with the State of Tennessee, APS received the full amount due for the screenings actually performed.  Pl.'s 56.1 Stmt. ¶¶ 33-34; Def.'s 56.1 Stmt. ¶¶ 33-34.

Plaintiff filed the instant action for breach of contract on December 30, 2011.  Doc. 1. The Complaint alleges that APS owes Plaintiff $2,248,520.88 in damages attributable to the unpaid balance of the invoices.  Compl. ¶¶ 35-36.  Defendant filed an Answer on March 1, 2012. Doc. 7.  The Answer asserts eight affirmative defenses:  (1) failure to state a cause of action; (2) lack of a meeting of the minds; (3) limitation of liability pursuant to section 7 of the Agreement; (4) duress; (5) breach of contract by Plaintiff; (6) breach of the implied covenant of good faith

and fair dealing; (7) waiver and/or estoppel;[4] and (8) failure to mitigate the alleged damages.

Answer ¶¶ 38-45.  The Court entered a Civil Case Discovery Plan and Scheduling Order on

April 18, 2012, setting a deadline of June 1, 2012 for filings of any amended pleadings.  Doc. 12.

The Order was amended twice to extend the discovery cutoff, but the pleading deadline was not

extended.  Docs. 23, 31.  Plaintiff moved for summary judgment on March 15, 2013.  Doc. 38.

That same day, Defendant moved for leave to file an amended answer and counterclaim.  Doc.

42.  The proposed amended pleading adds factual allegations to certain of the affirmative

defenses and introduces a counterclaim for rescission of the Agreement on the grounds of

unilateral mistake.  Decl. of Howard S. Wolfson (Amend) Ex. A, ¶¶ 42-46, Counterclaim ¶¶ 1-

77.[5]

## II.    Plaintiff's Motion for Summary Judgment

### A.  Applicable Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno*

*v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint*

*Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might

affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the

absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

---

[4] These are technically separate defenses and will be treated as such below (bringing the total number of asserted defenses to nine), but the Court lists them together to preserve the numbering that appears in Defendant's Answer.

[5] Citations to "Counterclaim ¶¶" refer to the enumerated paragraphs beginning on page 8 of the proposed amended answer.

(1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) (internal quotation mark omitted).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

### B.  Discussion

#### i.  The Minimum Fee Provision Is Unambiguous

The primary question presented by Plaintiff's motion for summary judgment is whether

the minimum fee provision in Exhibit B is ambiguous.  Under New York law,[6] the threshold

question of whether a contract is ambiguous is to be determined as matter of law, as is the

meaning of an unambiguous contract.  *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,

631 F.3d 42, 51 (2d Cir. 2011).  A New York appellate court recently reiterated that "[t]he

fundamental, neutral precept of contract interpretation is that agreements are construed in accord

with the parties' intent, [and that] [t]he best evidence of what parties to a written agreement

intend is what they say in their writing."  *Kasowitz, Benson, Torres & Friedman, LLP v. Duane

Reade*, 950 N.Y.S.2d 8, 11 (N.Y. App. Div. 2012) (second and third alterations in original)

(quoting *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002)) (internal quotation

marks omitted), *aff'd*, 987 N.E.2d 631 (N.Y. 2013); *see also Beal Sav. Bank v. Sommer*, 865

N.E.2d 1210, 1213 (N.Y. 2007) ("[T]he intention of the parties may be gathered from the four

corners of the instrument and should be enforced according to its terms.").  Words and phrases

are to be given their plain and ordinary meaning, and New York courts will commonly refer to

dictionary definitions in order to determine that meaning.  *Mazzola v. Cnty. of Suffolk*, 533

N.Y.S.2d 297, 297 (N.Y. App. Div. 1988); *see 10 Ellicott Square Court Corp. v. Mountain*

---

[6] The Agreement includes an express New York choice-of-law provision, and the parties do not dispute the
applicability of New York state contract law to this case.  Agreement at 6; *see Rockland Exposition, Inc. v. Alliance
of Auto. Serv. Providers of N.J.*, No. 08-CV-7069 (KMK), 2009 WL 1154094, at *5 (S.D.N.Y. Mar. 19, 2009)
(applying New York law under similar circumstances); *Fireman's Fund Ins. Cos. v. Siemens Energy & Automation,
Inc.*, 948 F. Supp. 1227, 1233 n.14 (S.D.N.Y. 1996) (applying New York law where the parties briefed the case on
that basis and there was no suggestion that another state's law should apply).

*Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (citing *Mazzola* and relying on a *Black's Law Dictionary* definition).

"[E]xtrinsic evidence may not be considered unless the document itself is ambiguous." *Duane Reade*, 950 N.Y.S.2d at 11 (quoting *S. Rd. Assoc., LLC v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005)) (internal quotation mark omitted); *see also W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.").[7]  "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  *Duane Reade*, 950 N.Y.S.2d at 11 (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)).

Conversely, a contract is ambiguous where its language is susceptible to multiple reasonable interpretations.  *Brad H. v. City of New York*, 17 N.Y.3d 180, 186, 951 N.E.2d 743 (N.Y. 2011).  When a contract is ambiguous and there is relevant extrinsic evidence as to the parties' intent, the proper interpretation of the disputed language becomes a question of fact for the jury.  *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  "Mere

---

[7] Defendant urges a more context-driven approach to contract interpretation.  *See* Def.'s Mem. of Law in Opp'n (MSJ) at 18-20.  This Court has previously acknowledged that "there is substantial support for the view that 'evidence of the context in which a contract was executed always is admissible because words, whatever their apparent clarity, take on meaning from the circumstances in which they are used.'"  *Toto, Inc. v. Sony Music Entm't*, No. 12 Civ. 1434 (LAK), 2012 WL 1416884, at *1 (S.D.N.Y. Apr. 23, 2012) (quoting *Fireman's Fund*, 948 F. Supp. at 1233-34).  *Fireman's Fund*, however, also said the following in its discussion of that alternative interpretive approach:  "There are *suggestions* that New York adheres to this view, although the possible inconsistency with the requirement that ambiguity be determined from the four corners of the contract remains unsolved."  948 F. Supp. at 1233 (emphasis added).  Given the abundance of recent authority supporting the four-corners approach set forth in the body of this Opinion, the Court declines to wade further into this debate at the present time.

assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *Duane Reade*, 950 N.Y.S.2d at 11 (quoting *Unisys Corp. v. Hercules Inc.*, 638 N.Y.S.2d 461, 463 (N.Y. App. Div. 1996) (internal quotation marks omitted). Similarly, ambiguity will not be found "where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" *Seiden*, 959 F.2d at 428 (alteration in original) (quoting *Bethlehem Steel Co. v. Turner Const. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)).

In light of the foregoing, the Court starts with the plain language of the Agreement and concludes that the phrase "Customer projection" unambiguously refers to clinic participation estimates received from APS.

The disputed language in Exhibit B appears in the subsection "Other Services & Fees—Standard Minimums" and provides that the "standard minimum" for "health screening clinics" will be "40 screenings, or 90% of *Customer projection*, whichever is greater." Agreement at 17 (emphasis added). The Agreement includes a definitions section; however, that section does not define the phrase "Customer projection" or the individual words "Customer" and "projection." *See id.* at 1.

*Webster's* dictionary offers five definitions of "customer," only one of which reasonably applies in the present context: "one that purchases some commodity or service." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 559 (2002). The only applicable definition of "projection," out of the twelve provided in *Webster's*, is "the carrying forward of a trend into the future; an *estimate* of future possibilities based on a current trend." *Id.* at 1813-14 (emphasis added). The *Oxford English Dictionary* provides similar insight into the

words' common meanings.  Of its multiple definitions of the word "customer," the only one

applicable here reads, in pertinent part, "a buyer, purchaser."  4 OXFORD ENGLISH DICTIONARY

169 (2d ed. 1989).  The relevant definition of "projection" is "[a] forecast based on present

trends."  12 *id.* at 600.  "Forecast," in turn, is defined as "[a] forecasting or anticipation; a

conjectural *estimate* or account, based on present indications, of the course of events or state of

things in the future, *esp.* with regard to the weather."  6 *id.* at 46 (emphasis added).[8]

       Given the terms of the Agreement, the only entity that can properly be considered a

"Customer" is APS, which was purchasing services from Summit.  Thus, the phrase "Customer

projection" necessarily refers to a projection provided by APS.  The dictionary definitions also

support Plaintiff's argument that "projection" was used as a synonym for "estimate."  Although

the two are not precisely synonymous—"projection" refers to a *type* of estimate that predicts

future events or conditions based on current trends—the overlap between the terms demonstrates

that Plaintiff's interpretation is a reasonable one.  Indeed, as will be discussed in more detail

below, it is the only reasonable one.  Because the language of the minimum fee provision

requires that a "Customer projection" be capable of being greater or less than "40 screenings," it

follows that the word "projection," as used in this case, must refer to an estimate of the number

of screenings that will be conducted at a particular clinic.

---

[8] In briefing the issue, Summit provides partial quotations from the applicable *New Oxford American Dictionary*
definitions of "customer" and "projection."  Pl.'s Mem. of Law in Supp. (MSJ) at 18.  The full text of those
definitions generally comports with the ones presented in the body of this Opinion.  *See* NEW OXFORD AM.
DICTIONARY 421, 1362 (1st ed. 2001) (defining "customer" as "a person or organization that buys goods or services
from a store or business," and defining "projection" as "an estimate or forecast of a future situation or trend based on
a study of present ones").  The Court surveyed and relied on different dictionaries in order to guard against the risk
that a one-off formulation would skew the analysis.  At the same time, the Court finds it noteworthy that APS
neither offers its own definitions nor directly confronts the plain meaning of the terms.

Moreover, the surrounding provisions confirm that "Customer projection" was meant to refer to estimates received from APS.  There is a cancellation fee imposed "if Customer cancels a confirmed event ten (10) business days or less prior to the scheduled date for reasons not related to Summit Health's performance."  Agreement at 17.  On the other hand, the Agreement provides that, "[i]f in 10 business days or less prior to the Clinic, Customer should increase its participation estimate sufficiently to require Summit to increase the number of staff, Summit shall directly invoice Customer an expediting fee of $300 for each increase in staff number."  *Id.* at 18.  The optional Small Clinic Fee is the most illuminating for present purposes.  That fee provision, which appears under the subheading "NonStandard Clinics," reads:

> Summit will waive the 40 participant Clinic minimum for a one-time Small Clinic Fee of $425 per clinic, and will invoice only for the greater of the per participant charges or *90% of the estimate* for that Clinic.  Customer may opt to keep the 40 minimum or pay the Small Clinic fee, whichever is more advantageous.

*Id.* (emphasis added).  In other words, if "Customer" elects to pay the Small Clinic Fee, the forty-participant minimum is eliminated but the 90% minimum still applies.  Finally, a Short Lead Time fee applies if Summit "accept[s] a Customer requested date with less than 4 weeks advance notice," and that fee will be invoiced to "Customer."  *Id.*

These provisions, taken together, make it clear that "Customer" refers to APS.  No other party or entity was in a position to undertake the contemplated actions, nor would it make sense for any other entity to receive invoices reflecting the associated fees.

The provisions similarly render the meaning of "projection" unambiguous.  The Small Clinic Fee provision clearly indicates that, if the forty-participant minimum is disregarded, the minimum fee will be calculated based on "90% of the *estimate*."  There is no doubt that this is a reference to the "90% of Customer projection" prong of the more general minimum fee provision

16

at issue in this case.  In other words, Exhibit B clearly treats "projection" and "estimate" as synonyms.

Defendant's argument that "Customer projection" could reasonably be read as a reference to online appointments is untenable for a number of reasons.  First, the Agreement specifically includes the task of "scheduling appointments" among Summit's responsibilities.  Agreement at 11.  Summit was responsible for maintaining the online appointment system, and the appointments themselves were to be made by the prospective clinic participants.  "Customer" (*i.e.*, APS) was in no way responsible for scheduling online appointments.  In addition, the suggestion that "projection" is intended as a synonym for "appointments" further "strain[s] the contract language beyond its reasonable and ordinary meaning," especially since the Small Clinic Fee provision clearly equates "projections" with "estimates."  At any given moment, the online appointment system only communicated facts about who planned to attend a clinic as of that particular point in time, and the Agreement also contemplated telephone appointments and walk-in screenings.  *See id.* at 11, 17.  There is thus no basis—either in general usage or in the present context—for the notion that a series of appointments constitutes a "conjectural estimate" of future circumstances.

It should also be noted that the phrase "Customer projection," though the center of much debate in the parties' briefs and in the supporting evidentiary record, is not presented as a defined term or as a term of art in the Agreement.  The same can be said of the phrase "participation estimate."  Thus, while Defendant is correct in observing that differing language within a contract is typically presumed to convey divergent meanings, *see* Def.'s Mem. of Law in Opp'n (MSJ) at 22-23, the Court declines to apply that presumption to the language at issue in this case, where the interchangeable use of the terms "projection" and "estimate" is self-evident from the

17

face of the Agreement.  The terms' ordinary meanings and the overall structure of Exhibit B

demonstrate that the alternative constructions are being used synonymously.[9]  In addition,

Exhibit B includes references to "appointments" and the "online appointment system," so

Defendant's argument undermines its own proposed interpretation of the contract.  While the use

of inconsistent phraseology in this case may not be a model of good drafting, it alone does not

render ambiguous a contractual provision that is otherwise clear.

Likewise, the minimum fee provision is not rendered ambiguous merely by virtue of the

Agreement's silence on the procedural questions of how, when, or in what form the estimates

were to be provided.  As APS observes, the Agreement does not specifically require that a

"Customer projection" be provided at all.  *Id.* at 24-25.  However, this situation is readily

distinguishable from the one found in *New York ex rel. Spitzer v. Saint Francis Hosp.*, 289 F.

Supp. 2d 378 (S.D.N.Y. 2003).  In that case, this Court concluded that a dissolution provision

was "facially ambiguous" because it failed to indicate whether there was a required method of

dissolution.  *Id.* at 387.  The dispute, however, concerned precisely that point:  whether the

contract "require[d] the parties to follow any particular *form* of dissolution, be it voluntary or

judicial."  *Id.* at 386 (emphasis in original).  Had this case arisen because APS refused to provide

---

[9] Defendant argues that the Agreement's failure to define "Customer projection" is itself a source of ambiguity.
Def.'s Mem. of Law in Opp'n (MSJ) at 24.  The cases Defendant cites, however, do not compel such a result in all
instances.  In *Omni Berkshire Corp. v. Wells Fargo Bank, N.A.*, 307 F. Supp. 2d 534, 540 (S.D.N.Y. 2004), the
undefined terms "all risk" and "comprehensive all risk insurance" made it impossible to determine what risks were
to be covered by the "all risk" insurance policy at issue.  The other two citations are to cases where, unlike here, the
court found that there were multiple reasonable interpretations of the undefined terms.  *See Eastman Kodak Co. v.
Kyocera Corp.*, No. 10-CV-6334, 2012 U.S. Dist. LEXIS 152250, at *17-18 (W.D.N.Y. Oct. 22, 2012) ("On these
facts, it could reasonably be understood that the parties intended [that the defendant's interpretation governs].");
*Glassalum Int'l Corp. v. Albany Ins. Co.*, No. 03 Civ. 9166 (DC), 2005 U.S. Dist. LEXIS 9767, at *22 (S.D.N.Y.
May 20, 2005) (finding that two terms could "arguably" be assigned alternative meanings).  As discussed above,
courts will frequently refer to dictionary definitions to uncover a term's ordinary meaning.  Such an approach
necessarily assumes that contractual terms are not rendered ambiguous merely because they are not specifically
defined within the four corners of the contract.

estimates at all, then the reasoning in *Saint Francis Hospital* might well be persuasive, but such is not the controversy the Court is being asked to decide.  It is quite feasible that, had APS not provided any estimates, Summit would simply have been unable to invoke the minimum fee provision.  As will be discussed in more detail below, however, that is not what happened in this case.  Moreover, the Court in *Saint Francis* specifically noted that "both possible proposed interpretations are reasonable," further distinguishing those facts from the ones at issue here.  *Id.* at 387.

ii.  **The Agreement Is Ambiguous as to Whether the Minimum Fee Provision Applies to All Clinics**

In opposing summary judgment, Defendant briefly points out that there is "a question as to whether Summit is entitled to anything more per screening than the $37 default rate after the 150th clinic."  Def.'s Mem. of Law in Opp'n (MSJ) at 28 n.6; *see* Decl. of John McDonough (MSJ) ¶¶ 30-31.  Although Defendant buries this argument in a footnote and Plaintiff does not address it at all, the Court is of the opinion that the issue raises a genuine question of material fact for trial.

The ambiguity arises from two provisions in Exhibit A to the Agreement.  Section (g)(3) of that Exhibit states that, "[i]n the first year of the program and in alternate years thereafter (e.g., 2011, 2013, etc.), Summit Health shall hold at least one hundred fifty (150) screenings per health screen survey period with a minimum capacity of fifty (50) appointments per screening." Agreement at 10.  "Screenings," in this context, is being used to refer to clinics, while "appointments" refers to the individual health screenings performed at the clinics.  Section (g)(4) says that "Summit Health shall also perform additional screenings (over and above those

required by subsection (3) above) during any year of this SOW[10] at the per onsite health screening rate (default rate) in Exhibit B." *Id.* at 11.

There are at least two reasonable interpretations of these provisions: (1) Section (g)(4) overrides the standard pricing terms after the 150th clinic and only permits Summit to bill based on the per-clinic rate; or (2) Section (g)(4) clarifies that the standard default rate—and not a different, supplemental rate—continues to apply even if Summit is required to perform more than the minimum number of clinics. The first interpretation seems somewhat inconsistent with the overall structure of the contract, given that its effect would extend beyond just the minimum fees and allow APS to avoid paying the other miscellaneous fees that Exhibit B charges for screenings. On the other hand, the latter interpretation would render Section (g)(4) fairly superfluous, given that the default rate would clearly have applied in any event absent a provision affirmatively removing certain clinics from its scope. *See* Agreement at 3 (providing that Exhibit B governs payments for Summit's services); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (discussing the general preference, shared by New York state courts, for avoiding interpretations that render a contractual provision superfluous).

Because there are arguments in favor of both readings of Section (g)(4), the Court concludes that the provision is ambiguous as a matter of law. Extrinsic evidence, to the extent it is available, can therefore be brought to bear. However, as noted above, neither party has come forward with evidence of the intent underlying this portion of the Agreement. Therefore, since Plaintiff bears the burden of demonstrating the absence of a genuine issue of material fact, the

---

[10] The acronym "SOW" is undefined but appears to be a reference to the Agreement itself.

Court denies the motion for summary judgment with respect to all but the first 150 clinics during each applicable health screen survey period.

### iii.  Summit's Damages Depend on What Estimates APS Provided[11]

### a.  Minimum Fees for Clinics Held Prior to March 18, 2011

Having rejected APS's argument regarding online appointments, there is no question that, for the period prior to March 18, 2011, the only estimates that Summit received from APS were the Watson estimates.  APS argues that, if the online appointments were not "Customer projections," then no such projections were provided and the 90% minimum simply falls away.  Def.'s Mem. of Law in Opp'n (MSJ) at 29.  This argument is flawed insofar as, in presenting it, APS assumes that it needed to have specifically provided that its estimates were "to be used for the purposes of billing or calculating fees."  *Id.*  That suggestion is indicative of a line of reasoning that recurs throughout Defendant's papers—namely, that Exhibit B somehow sought to distinguish staffing estimates from billing estimates.  Such reasoning is without merit.  As previously discussed, the contract uses the terms "projection," "estimate," and their derivatives interchangeably; nowhere does the contract suggest that two sets of projections are to be provided.  Nor would such a reading follow absent explicit contractual language to the contrary: the notion that APS would have the ability to submit inconsistent sets of projections—one to ensure sufficient staffing and another to minimize potential fee exposure—is unreasonable on its face.

---

[11] Because at least the first 150 clinics are subject to the minimum fee provision, the Court proceeds to the issue of what estimates APS provided.  The invoices indicate that the 150-clinic threshold was hit during February.  *See* Decl. of Douglas C. Finch (MSJ) Ex. 18-19.  However, given that the jury may conclude that the minimum fees apply in all cases, the Court's discussion will cover all six months of the screening program.

Because the minimum fee language is unambiguous, and subject to the above discussion regarding clinics after the first 150, the Court finds that Summit is entitled to demand minimum payments based on the Watson estimates for clinics held prior to March 18, 2011.[12]

### b. Minimum Fees for Clinics Held After March 18, 2011

APS asserts that the Hines email directed Summit to treat online appointments as "Customer projections" for clinics held after March 18. Def.'s Mem. of Law in Opp'n (MSJ) at 29-30. Summit says the Hines email was unclear. Pl.'s Mem. of Law in Supp. (MSJ) at 27. In addition, Summit argues that the email is irrelevant because (1) APS continued to provide separate estimates for each clinic, (2) Summit was "entitled" to use those estimates in calculating minimum fees, and (3) Hines could not amend the Agreement via an email to Summit. *Id.* However, nothing on the face of the Agreement *precludes* APS from basing its "Customer projection" on data from the online appointment system. APS merely had not done so prior to March 18. A change in the form of the estimate provided pursuant to the Agreement does not constitute an amendment of the Agreement itself. Further, the fact that Watson continued to provide estimates apart from the online appointments does not render Hines' instruction

---

[12] In opposing summary judgment, Defendant alleges that Summit would not have had the capacity to satisfy its obligations under the Agreement had the Watson estimates turned out to be accurate. Def.'s Mem. of Law in Opp'n (MSJ) at 34-35. Defendant asserts that "part of Summit's obligation was to staff screening clinics so that it could perform the number of screenings for which it was billing APS based upon APS's alleged Customer projections." *Id.* at 35. There is nothing in the Agreement, however, that requires Summit to staff in this way, nor does Exhibit B restrict the minimum fee provision to Customer projections upon which Summit actually relied. Of course, to the extent Summit gambled by discounting APS's estimates, it assumed the risk that it would *potentially* be unable to meet its obligations under the contract. The mere possibility of a breach, however, does not amount to nonperformance. The question of whether Summit *actually* breached its contractual obligations will be taken up *infra* in the discussion of APS's affirmative defenses.

irrelevant; rather, it creates a factual dispute as to what served as APS's "Customer projection" for purposes of the minimum fee provision.[13]

In its reply papers, Summit argues that it would be "impossible, as a practical matter," for Summit to treat the online appointments as participation estimates because APEX required that an estimate be provided for each clinic before any online appointments for that clinic could even be scheduled.  Pl.'s Reply Mem. of Law in Further Supp. (MSJ) at 10-11.  Even if Summit is correct from a logistical standpoint, the alleged impossibility of Hines's request—a request the meaning of which Summit argues was unclear—cannot by itself eliminate the possibility that the Hines email effectively voided the Watson estimates and thus precluded Summit from relying on those figures beyond March 18.  Because the Court must draw all inferences against the party seeking summary judgment, the Court therefore concludes that there is a genuine question of material fact as to what "Customer projections," if any, APS provided for clinics held after March 18, 2011.

---

[13] Note that the denial of summary judgment with respect to this issue does not point to a latent ambiguity in the terms of the Agreement more generally, but merely to a factual question with respect to what APS actually provided during this timeframe.  *See* Def.'s Mem. of Law in Opp'n (MSJ) at 20.  "Even where an agreement seems clear on its face, a 'latent ambiguity' may exist by reason of 'the ambiguous or obscure state of extrinsic circumstances to which the words of the instrument refer.'"  *Teig v. Suffolk Oral Surgery Assocs.*, 769 N.Y.S.2d 599, 600 (N.Y. App. Div. 2003) (quoting *Lerner v. Lerner*, 508 N.Y.S.2d 191, 194 (N.Y. App. Div. 1986)).  The ambiguities in both *Lerner* and *Teig* involved situations that the parties had not anticipated when they drafted the language of their respective contracts.  *See Teig*, 769 N.Y.S.2d at 601; *Lerner*, 508 N.Y.S.2d at 194.  In *Matter of Phillips*, which Defendant also cites in its brief, the state court found that a decedent's use of the phrase "land appurtenant thereto" did not clearly delineate the portion of his property that he intended to bequeath.  957 N.Y.S.2d 778 (N.Y. App. Div. 2012).  There are no such ambiguous circumstances in this case.  It remains unambiguous as a matter of law that the minimum fee provision refers to estimates of clinic participation received from APS; the factual dispute merely goes to the proper basis for measuring damages and will turn on factual determinations (such as how to interpret the Hines email) that are not for the Court to resolve at the summary judgment stage.

### iv.  Affirmative Defenses

#### a.  Meeting of the Minds

APS takes the position that, even if the term "Customer projection" is unambiguous, there are material questions of fact with respect to whether there was a meeting of the minds on this point.  *See* Answer ¶ 39; Def.'s Mem. of Law in Opp'n (MSJ) at 28-29.  APS mistakenly conflates this affirmative defense with the rescission argument raised in its motion to amend. The motion to amend seeks rescission based on the distinct legal theory of unilateral mistake. The Court therefore addresses the meeting of the minds defense separately and rejects it as a matter of law.

Defendant is correct, of course, that New York courts will not enforce a contract if there was no meeting of the minds regarding one of its material terms.  *See Computer Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co., Inc.*, 782 N.Y.S.2d 117, 119 (N.Y. App. Div. 2004).  However, it is equally well established that this inquiry is an objective one.  *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007); *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999).  The defense fails, and the subjective intent of the parties is irrelevant, if the contract is unambiguous.  *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1278 (2d Cir. 1989); *Commins v. Couture*, 785 N.Y.S.2d 160, 162 (N.Y. App. Div. 2004).  Since the phrase "Customer projection" unambiguously refers to estimates of employee participation provided to Summit by APS, the meeting of the minds defense fails as a matter of law.

#### b.  Duress

APS's Answer alleges duress as an additional affirmative defense.  The allegation is that "Summit forced APS to execute the [Agreement] under duress by unlawfully threatening that it

24

would not provide information to APS, unless and until APS executed the [Agreement], that APS was required to report to the State of Tennessee, leaving APS with no alternative but to execute the [Agreement]." Answer ¶ 41. Summit argues against this defense in its moving papers. Pl.'s Mem. of Law in Supp. (MSJ) at 31-33. APS does not address the issue in its response. It therefore appears that APS has abandoned its duress defense. *See, e.g.*, *Dunkin' Donuts Franchised Restaurants LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662 KAM MDG, 2009 WL 2997382, at *9 (E.D.N.Y. Sept. 15, 2009) ("As a result of defendants' failure to oppose plaintiffs' [summary judgment] motion as to their defenses and counterclaims, the court finds that the defendants abandoned their affirmative defenses and counterclaims."); *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) ("[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed."); *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) ("We note at the outset that plaintiff does not address these claims in its opposition papers, enabling the Court to conclude that it has abandoned them."). In light of Defendant's failure to respond to Plaintiff's motion with respect to duress, the Court deems that affirmative defense abandoned.

Even if the defense were not abandoned, it would not survive the instant summary judgment motion. New York law will void a contract if one party can show that "its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011); *see Stewart M. Muller Const. Co., Inc. v. N.Y. Tel. Co.*, 359 N.E.2d 328, 328 (N.Y. 1976). Financial pressure or unequal bargaining power alone is insufficient to establish duress, and "[t]he principle . . . extends no further than equity demands." *Interpharm*, 655 F.3d at 142. Here, the Agreement

25

had already been the subject of extensive negotiations, and APS's "point man" in those

negotiations was one of its in-house attorneys.  *See Mathias v. Jacobs*, 167 F. Supp. 2d 606, 614

(S.D.N.Y. 2001) (rejecting duress defense where, among other things, the parties were

"experienced businessmen" who had been represented by counsel during negotiations); *C.B.S.*

*Rubbish Removal Co., Inc. v. Winters Waste Servs. of N.Y., Inc.*, 797 N.Y.S.2d 501, 504 (N.Y.

App. Div. 2005) (rejecting duress argument where negotiations took place over a "period of

months," giving the parties "ample opportunity to exercise free will").  Nothing in the record

suggests that Summit was taking advantage of the situation in order to garner more favorable

terms from APS; rather, it was merely requesting that APS finalize a contract pursuant to which

Summit had already been performing for over two months and that included the BAA pursuant

to which it could provide confidential patient information to APS.  In addition, the specific

provision the Court is now being asked to enforce is one that APS acknowledges was present in

every draft of the Agreement, and it is a provision that Dominianni had indicated was

"acceptable to APS" from as early as December 2010.  Equity does not demand that the

Agreement be voided under such circumstances.  Indeed, without a contract in place, Summit

was under no legal obligation to perform at all.  The Court therefore cannot conclude that

Summit acted wrongfully in declining to execute a stand-alone BAA at this late stage in the

negotiations.

### c.  Breach of Contract by Summit

Defendant's next affirmative defense alleges that Summit breached its obligations under

the Agreement, thus "significantly diminish[ing] the value of the services APS had agreed to

purchase from Summit and damag[ing] APS's standing with the State."  Def.'s Mem. of Law in

Opp'n (MSJ) at 34; *see* Answer ¶ 42.  The alleged deficiencies included failure to adequately

staff clinics, failure to provide appropriate and trained staff, failure to bring adequate supplies, shutdowns of the online appointment system, difficulties in transferring information to APS, and the release of private health information.  Def.'s Mem. of Law in Opp'n (MSJ) at 34.  For the sake of argument, the Court will assume that all of APS's allegations are true.  Nevertheless, the affirmative defense fails as a matter of law.

With respect to this affirmative defense, it is Defendant who bears the burden of proof regarding its alleged right to recoupment or offset.  *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d 256, 289-90 (S.D.N.Y. 2010) (collecting New York state court cases regarding allocation of the burden of proof).  Thus, all Summit is required to do at summary judgment is point to an absence of evidence going to an essential element of Defendant's claim.  In this case, Plaintiff has done that and more:  it has highlighted evidence in the record indicating that APS did not suffer any damages as a result of Summit's alleged breaches.  *See LNC Investments, Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d Cir. 1999) (noting that, under New York law, failure to prove damages is fatal to a claim for breach of contract).  APS stipulated that it was paid in full, under its general contract with the State of Tennessee, for the screenings actually performed.  Pl.'s 56.1 Stmt. ¶ 34; Def.'s 56.1 Stmt. ¶ 34.  Likewise, APS admitted that it did not pay any liquidated damages or other monetary penalties to the State by virtue of Summit having breached the Agreement.  Decl. of Jeff E. Butler (MSJ) Ex. 31, at 8 (Response to Request to Admit 17).  McDonough testified at his deposition that he was not aware of any financial harms suffered by APS as a result of Summit's alleged breaches.  Decl. of Jeff E. Butler (MSJ) Ex. 27, at 105:8-117:2.

Despite the fact that Plaintiff raises each of these evidentiary points in its moving papers, Defendant does nothing to counter them in its opposition brief.  The Court therefore finds that

27

there is no triable question of material fact with respect to the alleged diminution in the value of services APS received.  APS has similarly failed to come forward with any evidence supporting its argument that its standing with the State of Tennessee was damaged.  Even if it had done so, the Agreement's limitation of liability clause, on which APS relies elsewhere in its papers, expressly provides that the parties cannot be held liable for special, incidental or consequential damages, including any damages attributable to a loss of goodwill.  Agreement at 4.  APS is thus not entitled to any offsetting damages by virtue of Summit's allegedly deficient performance.

### d.  Breach of the Implied Covenant of Good Faith and Fair Dealing

The discussion in the preceding section similarly disposes of the affirmative defense alleging breach of Summit's implied covenant of good faith and fair dealing.  Answer ¶ 43.  New York law provides that every contract includes such a covenant.  *See Kader v. Paper Software, Inc.*, 111 F.3d 337, 342 (2d Cir. 1997); *Cohen v. Elephant Wireless, Inc.*, No. 03 Civ. 4058 (CBM), 2004 WL 1872421, at *11 (S.D.N.Y. Aug. 19, 2004).  The covenant is breached when one party's actions "would deprive the other party of receiving the benefits under their agreement."  *Sorenson v. Bridge Capital Corp.*, 861 N.Y.S.2d 280, 282 (N.Y. App. Div. 2008).  However, "a breach of an implied covenant of good faith and fair dealing is intrinsically tied to the damages allegedly resulting from a breach of the contract."  *Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d 730, 731 (N.Y. App. Div. 1995); *see also Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) ("[B]reach of [the implied covenant] is merely a breach of the underlying contract." (quoting *Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)) (internal quotation mark omitted)).  Thus, absent evidence of any cognizable damages sustained by APS as a result of a breach by Summit, the affirmative defense fails as a matter of law.

### e. Waiver

APS argues that its liability for January and February 2011 is limited to the amounts

included on the invoices prepared for those months.  Def.'s Mem. of Law in Opp'n (MSJ) at 31;

*see* Answer ¶ 44.  In short, APS claims that Summit waived its right to collect the full amount

due under the minimum fee provision by sending the discounted invoices.  The Court finds it

unnecessary to reach the question of whether the January and February invoices constituted a

waiver of Summit's rights under the contract, as the record demonstrates that any such waiver

was subsequently withdrawn.

New York law permits waivers to be withdrawn to the extent they are executory, as long

as the counterparty receives notice of the withdrawal and is given a reasonable time to perform.

*Nassau Trust Co. v. Montrose Concrete Products Corp.*, 436 N.E.2d 1265, 1270 (N.Y. 1982).

The party asserting waiver—in this case, APS—bears the burden of demonstrating both that

there was a valid waiver and that such waiver was not withdrawn.  *Blue Ridge Investments, LLC*

*v. Anderson-Tully Co.*, No. 04 CIV. 3777 HB FM, 2005 WL 44382, at *7 (S.D.N.Y. Jan. 10,

2005).  Even assuming, *arguendo*, that APS were able to defeat summary judgment on the

threshold question of waiver, APS has not offered any evidence demonstrating that such waiver

was not withdrawn.  To the contrary, APS's own evidence shows that, in the course of

attempting to reach an amicable resolution of the dispute, Summit clarified that the discounted

invoices were intended merely as conditional offers.  A May 17, 2011 email from Finch to

Glazer and Steve DaRe observed that Summit had "offered to APS significant invoice discounts .

. . in good faith that APS would pay the full invoice amounts on time, but this is already not the

case."  Decl. of Howard S. Wolfson (MSJ) Ex. MM, at APS 4902.  Finch went on to note that

Summit's professional advisors "believe that any invoice discounts we have offered in good faith

29

should expire 30 days after invoice date." *Id.*  A subsequent email from Finch to Glazer, dated September 19, 2011, listed both the amount due "per the letter of the agreement" and the amount APS would owe if the discounts Summit "offered" were included in the calculation. *Id.* at APS 7422.  Later that day, Finch emailed McDonough, copying Vaccaro and Glazer, again referring to the alternative amounts due depending on whether the discounts Summit "offered" were taken into account. *Id.* at APS 1247-48.

Summit's willingness to accept the discounted fees in September 2011 does not preclude it from seeking to enforce the terms of the contract in court, given that APS refused to pay the reduced minimum fee.[14]  Indeed, even without the Finch emails, the filing of the instant action would itself be sufficient to establish the withdrawal of any alleged waiver. *See Kott v. Kott*, 229 N.Y.S.2d 471, 471 (N.Y. App. Div. 1962) ("[T]he waiver was executory and should have been held to have been withdrawn by service of the summons and complaint."), *aff'd*, 202 N.E.2d 385 (N.Y. 1964).  In light of APS's refusal to pay the portion of the invoices attributable to the discounted minimum fees, it is clear that any waiver remained executory and that APS did not rely on the alleged waiver to its detriment.[15]  *See Semple v. Eyeblaster, Inc.*, No. 08 CIV. 9004

---

[14] Nor does Summit's willingness to accept a discounted fee create a problem with respect to the limitation of liability clause in section 7 of the Agreement. *See* Def.'s Mem. of Law in Opp'n (MSJ) at 32; Agreement at 4. Even if APS is correct that the January and February invoices "essentially calculate Summit's alleged lost profits," Def.'s Mem. of Law in Opp'n (MSJ) at 32, Summit is not seeking recovery of those amounts in the instant action. Rather, it is Defendant who seeks to cap Summit's recovery at those amounts.  Nothing in the limitation of liability clause precludes a party from pursuing standard contract damages, which is what Summit is doing here.  Thus, APS's third affirmative defense—that the limitation of liability clause bars recovery in this action—fails as a matter of law. *See* Answer ¶ 40.

[15] APS argues that it "could not have breached the [Agreement] by failing to pay invoices that it never received." Def.'s Mem. of Law in Opp'n (MSJ) at 31.  APS is theoretically correct on this point, which is why any waiver would have been irrevocable had APS actually relied on it (*i.e.*, if it had paid the proposed alternative minimum fees).  However, APS breached the Agreement when it refused to pay *any* minimum fees for January or February. The waiver question therefore goes solely to the amount of damages APS owes as a result of its breach.

(HB), 2009 WL 1457163, at *6 (S.D.N.Y. May 26, 2009).  Thus, Summit is entitled to recover

the full amounts due, pursuant to the express terms of the contract, for clinics performed in

January and February 2011.

### f.  Estoppel

APS next argues that there are triable issues with respect to its alleged estoppel defense.

*See* Answer ¶ 44.  To succeed on this affirmative defense, APS would need to show (1) that

Summit concealed or misrepresented facts with both (2) the intent or expectation that APS would

rely on the concealment or misrepresentation and (3) actual or constructive knowledge of the true

facts, and (4) that APS detrimentally relied on the misrepresentation or concealment.  *See*

*Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 412-13

(S.D.N.Y. 2011) (quoting *General Electric Cap. Corp. v. Eva Armadora, S.A.,* 37 F.3d 41, 45

(2d Cir.1994)).  APS argues that this standard is met because Summit represented that it needed

the estimates for staffing purposes and misled APS "to believe they were not being used for

billing."  Def.'s Mem. of Law in Opp'n (MSJ) at 32.  APS alleges that Summit did so with the

intent that APS would rely on the misrepresentation, and that APS did in fact rely to its detriment

when it provided the estimates.  *Id.*  Further, APS argues that Summit disregarded most of the

estimates in staffing the clinics, that Summit instead relied on its own projections and the online

appointment system, that it concealed its projections from APS, and that it billed APS based on

estimates that it had disregarded.  *Id.* at 32-33.

The estoppel argument fails as a matter of law.  First, there is no evidence supporting

APS's suggestion that it was affirmatively misled into believing that the Watson estimates were

*not* going to be used for billing purposes.  Moczul and his team at Summit simply did not speak

to the potential billing consequences at all, nor was it incumbent on them to do so.  The terms of

the contract unambiguously provided that APS would be charged minimum fees based on the participation estimates it provided, and it was not Summit's duty to remind APS of its contractual obligations.  Thus, the only possible misrepresentation or concealment would arise from Moczul's statements that Summit required estimates for staffing purposes, combined with APS's assertion that Summit actually relied on different figures in planning the clinics.  This argument also runs contrary to the evidence.  The evidence on which APS relies arguably raises questions of fact as to *why* Summit entered lower numbers into APEX for many of the clinics and *how* those lower numbers were calculated; it does not support an argument that Summit was intentionally using staffing as a guise by which to induce APS to provide estimates that would instead be used solely for minimum fee purposes.  *See id.* at 9-10.  Indeed, APS's own papers acknowledge that Summit did rely on the Watson estimates, in their unaltered form, for at least 55 clinics.  *Id.*  Finally, even assuming that Summit did engage in concealment or misrepresentation, APS states that it "relied to its detriment by providing estimates."  *Id.* at 32.  That statement is incomplete:  the detriment arose only because APS provided what proved to be *erroneously high* estimates, and the Agreement's minimum fee provision clearly allocated that risk to APS.[16]

---

[16] Here again the Court finds itself confronted with a troubling suggestion alluded to above—namely, that APS was somehow tricked into providing artificially high estimates *because* it did not realize it would be billed accordingly, thus implying that APS would have provided reduced estimates had it known it was in its best financial interest to do so.  Stated another way, implicit in APS's argument is that it willfully provided inflated estimates of employee participation because it believed it would suffer no financial penalty if it caused Summit to overstaff the clinics.  Given that APS's position, putting aside what it now alleges actually transpired, is that Watson and his team had been operating under the assumption that Summit was actually staffing, and thus incurring costs, based on the Watson estimates, it is difficult to see where the alleged "injustice" lies.  Def.'s Mem. of Law in Opp'n (MSJ) at 33.  One would hope—and the Court will presume—that APS and its employees would have made good-faith estimates regardless of which party was expected to bear the resultant costs.  Moreover, as discussed above, both Glazer and Watson testified at their depositions that the Watson estimates *did* represent good-faith estimates of expected participation.

For these reasons, the estoppel defense does not survive Plaintiff's motion for summary judgment.

### g.   Failure to Mitigate

APS also asserts an affirmative defense based on Summit's alleged failure to mitigate damages.  Answer ¶ 45.  Under New York law, the party that is injured by a breach of contract has "the duty of making reasonable exertions to minimize the injury."  *Holy Properties Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 661 N.E.2d 694, 696 (N.Y. 1995).  As this Court has previously emphasized, this duty only arises after the purported breach has occurred.  *See U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010).  In alleging a failure to mitigate in this case, APS points to the fact that Summit did not tell APS that it had prepared its own projections that were lower than Watson's figures, and that Summit did not inform APS that it planned to bill on the basis of the Watson estimates.  Def.'s Mem. of Law in Opp'n (MSJ) at 33.  However, the breach did not occur until APS refused to pay the minimum fees charged on the January invoice, at which point APS was well aware of how Summit was calculating those amounts.  Summit's alleged use of its own reduced estimates is similarly irrelevant:  by the time the breach occurred, APS knew that the Watson estimates generally exceeded actual participation levels.  Defendant's mitigation defense therefore fails as a matter of law.

### v.   Summary of Issues Surviving Summary Judgment

For the foregoing reasons, Plaintiff is entitled to summary judgment with respect to the first 150 clinics.[17]  With respect to the remaining clinics, the motion is denied because triable issues of material fact remain with respect to the following two questions:  (1) does Section

---

[17] The only affirmative defense not specifically addressed in the above discussion, failure to state a cause of action on which relief can be granted, clearly fails given the Court's ruling on the contract interpretation point.  *See* Answer ¶ 38.

(g)(4) of Exhibit A preclude Summit from charging minimum fees subsequent to the first 150

clinics; and (2) what "Customer projection," if any, did APS provide for clinics held after March

18, 2011?  In other words, for all but the first 150 clinics, summary judgment is denied because

there are lingering questions of fact as to whether APS breached the contract and, if so, the

extent of the damages to which Summit is entitled.

## III.     Defendant's Motion for Leave to Amend

### A.  Applicable Legal Standard

Parties are entitled to amend their pleadings once, as a matter of course, within 21 days

after serving the pleading or, if a responsive pleading is required, within 21 days after service of

a responsive pleading or a Rule 12 motion.  Fed. R. Civ. P. 15(a).  A party may not otherwise

amend its pleading without either the written consent of the opposing party or leave of the court.

Fed. R. Civ. P. 15(b).  "The court should freely give leave when justice so requires."  *Id.*  The

Supreme Court has held that it would be an abuse of discretion, "inconsistent with the spirit of

the Federal Rules," for a district court to deny leave without some justification, "such as undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, futility of amendment, etc."  *Foman v. Davis*, 371 U.S. 178, 182

(1962).

The Second Circuit has stated that a court should allow leave to amend a pleading unless

the non-moving party can establish prejudice or bad faith.  *AEP Energy Servs. Gas Holding Co.*

*v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*,

988 F.2d 344, 350 (2d Cir.1993)).  Motions to amend are ultimately within the discretion of the

district courts, *Foman*, 371 U.S. at 182, and they should be handled with a "strong preference for

resolving disputes on the merits." *Williams v. Citigroup Inc.,* 659 F.3d 208, 212-13 (2d Cir.

2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir.2005)) (internal quotation marks

omitted). "Courts in this district have consistently granted motions for leave to amend a

complaint where facts and allegations developed during discovery are closely related to the

original claim and are foreshadowed in earlier pleadings." *Stonewell Corp. v. Conestoga Title*

*Ins. Co.*, No. 04 CV 9867 KMW/GWG, 2010 WL 647531, at *2 (S.D.N.Y. Feb. 18, 2010).

Although permissive, the standard for leave to amend "is by no means 'automatic.'" *Billhofer v.*

*Flamel Technologies, S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *4 (S.D.N.Y. July 30, 2012)

(quoting *Klos v. Haskel*, 835 F. Supp. 710, 715 (W.D.N.Y. 1993)).

      Ordinarily, leave to amend may be denied on the basis of futility if the proposed claim

would not withstand a Rule 12(b)(6) motion to dismiss. *Dougherty v. Town of N. Hempstead Bd.*

*of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). However, when the motion to amend is filed

after the close of discovery and the relevant evidence is before the court, a summary judgment

standard will be applied instead. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.

2001) (noting that, in situations where the motion to amend is made in response to a summary

judgment motion and the parties have fully briefed the issue and presented all relevant evidence,

"the court may deny the amendment as futile when the evidence in support of the [movant's]

proposed new claim creates no triable issue of fact and the [non-moving party] would be entitled

to judgment as a matter of law"); *Huber v. Nat'l R.R. Passenger Corp.*, No. 10 Civ. 09348

(ALC) (DF), 2012 WL 6082385, at *5 (S.D.N.Y. Dec. 4, 2012) ("In the less common case where

the Court is asked to review a proposed amendment with the benefit of a full discovery record, a

futility analysis is still possible, but it will then turn on the question of whether the proposed

amended complaint would be subject to dismissal under Rule 56 of the Federal Rules of Civil

Procedure for lack of a genuine issue of material fact."); *Stoner v. N.Y.C. Ballet Co.*, No. 99 Civ. 0196 (BSJ), 2002 WL 523270, at *14 (S.D.N.Y. Apr. 8, 2002) (denying a motion to amend where the additional claim "would immediately be subject to dismissal on a motion for summary judgment").  The party opposing the amendment has the burden of establishing its futility. *Blaskiewicz v. Cnty. of Suffolk*, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998).

Modifications of Rule 16(b) scheduling orders are only permitted for good cause.  Fed. R. Civ. P. 16(b)(4).  The Second Circuit has held that this good cause standard, which is more stringent that the Rule 15(a) standard just discussed, must also be applied to motions to amend in cases where the scheduling order's deadline for amended pleadings has passed.  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339-40 (2d Cir. 2000).  The good cause analysis turns on the movant's diligence.  *Id.* at 340.

## B.  Discussion

### i.  Proposed Counterclaim for Rescission

The core of the debate surrounding Defendant's motion to amend centers on whether or not Defendant's proposed counterclaim is futile.  Because Defendant's motion to amend is made at this late stage in the proceedings, and because the Court has the full evidentiary record at its disposal, a summary judgment standard will be applied in assessing futility.[18]  *See DiPace v. Goord*, 308 F. Supp. 2d 274, 278-79 (S.D.N.Y. 2004) (applying a summary judgment standard

---

[18] Defendant concedes that its counterclaim "will not require any additional discovery."  Def.'s Mem. of Law in Supp. (Amend) at 34.  The Court is therefore confident that the necessary facts are contained in the expansive record currently before it.  In addition, although Defendant's moving papers proceeded under the assumption that a motion-to-dismiss standard would apply, its reply papers argue using a summary judgment standard.  *See, e.g.*, Def.'s Reply Mem. of Law in Further Supp. (Amend) at 13 ("[W]hether APS exercised ordinary care is a question of fact for trial.").  The Court is therefore satisfied that the parties have had an adequate opportunity to brief the issue.

where both parties submitted and relied on extensive outside evidence in making their arguments, and where the moving party was not seeking additional discovery).

The proposed counterclaim seeks rescission of the Agreement on the grounds of unilateral mistake. Decl. of Howard S. Wolfson (Amend) Ex. A, Counterclaim ¶¶ 67-77. New York law requires that the party seeking rescission on this basis establish that "(i) he entered into a contract based upon a mistake as to a material fact, and that (ii) the other contracting party either knew or should have known that such a mistake was being made." *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 343 (S.D.N.Y. 2008) (quoting *NCR Corp. v. Lemelson Med., Educ. and Research Found.*, No. 99 Civ. 3017 (KNF), 2001 WL 1911024, at *7 (S.D.N.Y.2001)), *aff'd*, 355 F. App'x 507 (2d Cir. 2009).[19] The

---

[19] In interpreting New York law, courts in this Circuit have been inconsistent with respect to whether unilateral mistake can justify rescission absent an allegation of fraud on the part of the counterparty. *Compare Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 585 (2d Cir. 2005) (stating that New York law permits rescission based on unilateral mistake only if that mistake "is accompanied by some fraud committed by the other contracting party"), *and De Sole v. Knoedler Gallery, LLC*, No. 12 Civ. 2313 PGG, 2013 WL 5452669, at *33 (S.D.N.Y. Sept. 30, 2013) ("A unilateral mistake must be 'coupled with some fraud.'" (quoting *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1990))), *with VCG*, 594 F. Supp. 2d at 343-44 (analyzing New York law on rescission without any mention of fraud), *and Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 599 (S.D.N.Y. 2006) (indicating that fraud is not required in situations where the mistake goes to a "basic assumption of the contract"), *supplemented*, 458 F. Supp. 2d 178 (S.D.N.Y. 2006). One Second Circuit opinion presents fraud and "knew or should have known" as alternative tests. *Middle East Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987) ("While it is true that New York courts will, in some cases, rescind contracts and void releases even in the absence of fraud where unilateral mistake is established, the mistake must be 'one which is known or ought to have been known to the other party.'" (citation omitted) (quoting *Assurance Co. v. Pulin,* 142 N.Y.S.2d 809, 810 (N.Y. App. Div. 1955) (per curiam))).

The Court finds that the Second Circuit's interpretation in *Middle East Banking* captures the general state of New York case law, though New York courts have themselves been far from clear on the issue of unilateral mistake. *Pulin*, the case on which the Second Circuit relied in *Middle East Banking*, required not only that the counterparty knew or should have known of the mistake, but also that the mistake be induced by "some ambiguity or peculiar circumstances." *Pulin*, 142 N.Y.S.2d at 810. However, a subsequent case observed that "[i]t is universally recognized that there is a right of rescission for a unilateral mistake if the mistake was known to the other party at the time of the negotiating of the contract and was not corrected by it." *Sheridan Drive-In, Inc. v. State*, 228 N.Y.S.2d 576, 582 (N.Y. App. Div. 1962); *see also Sanzotta v. Continuing Developmental Servs., Inc.*, 692 N.Y.S.2d 272, 273 (N.Y. App. Div. 1999) ("Defendant failed to meet its burden of establishing as a matter of law that it is entitled to rescind the agreements based upon a unilateral mistake known to plaintiff at the time the

moving party must also establish that it exercised ordinary care and that enforcement would be unconscionable.  *Id.* at 343-44 (quoting *William E. McClain Realty, Inc. v. Rivers*, 534 N.Y.S.2d 530, 531 (N.Y. App. Div. 1988)); *see also Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 331 (S.D.N.Y. 2002) (noting that a party seeking rescission based on unilateral mistake must demonstrate that it exercised ordinary care).  Rescission will be denied if the mistake arises out of negligence and "the means of knowledge were easily accessible." *Consumers Union of U.S., Inc. v. Campbell*, No. 88 Civ. 7980 (JMW), 1989 WL 304762, at *5 (S.D.N.Y. Nov. 16, 1989) (quoting *Da Silva v. Musso,* 428 N.E.2d 382, 386 (N.Y. 1981)) (internal quotation mark omitted).[20]

Based on the facts before it, the Court concludes as a matter of law that APS failed to exercise ordinary care.[21]  APS alleges that it entered into the contract under the mistaken belief

---

agreements were negotiated and left uncorrected by her *or* fraudulent misrepresentations made by plaintiff . . . ." (emphasis added) (citation omitted)).

In light of the foregoing, the Court is satisfied that the standard for rescission based on unilateral mistake set forth in the body of this Opinion comports with New York State case law on the subject.

[20] Defendant argues that rescission should only be denied if the mistake results from something more than mere negligence.  Def.'s Reply Mem. of Law in Further Supp. (Amend) at 12-13.  There is New York State case law on both sides of this issue.  *Compare Cox v. Lehman Bros., Inc.*, 790 N.Y.S.2d 16, 17 (N.Y. App. Div. 2005) ("Such a windfall should be avoided given no indications that defendant lacked good faith or intentionally avoided making an inquiry it had reason to know would disclose the true facts."), *with Morey v. Sings*, 570 N.Y.S.2d 864, 867 (N.Y. App. Div. 1991) (rejecting a rescission claim because the defendant failed to establish that "ordinary care" would not have prevented the mistake).  One case even suggests that negligence is not a factor at all if the counterparty was allegedly aware of the mistake.  *See Bailey Ford, Inc. v. Bailey*, 389 N.Y.S.2d 181, 183 (N.Y. App. Div. 1976) (observing that negligence bars rescission in a situation where the parties alleging mistake do not claim that the counterparty "shared in their mistake or was aware of it").  Given the apparent tension in the case law and the absence of contrary authority from the New York Court of Appeals, the Court will adhere to the interpretation of the ordinary care requirement that has previously been applied to cases within this District.

[21] The case law belies Defendant's argument that the issue of ordinary care is always a question of fact for trial.  *See* Def.'s Mem. of Law in Supp. (Amend) at 30; Def.'s Reply Mem. of Law in Further Supp. (Amend) at 13.  In *Kraft Foods*, this Court reviewed the circumstances surrounding an alleged mistake before finding that it could not make the ordinary care determination "[b]ased on the evidence before us," thus indicating that the outcome was driven by the specific evidentiary record and not by a general legal principle.  213 F. Supp. 2d at 331.  Likewise, in *Lehman*

that "the number of online appointments made by State employees was the 'Customer projection' for each clinic referred to in Exhibit B." Decl. of Howard S. Wolfson (Amend) Ex. A, Counterclaim ¶ 68. As discussed above, however, the unambiguous terms of the contract foreclose this possibility. There is no question that the disputed provision appeared in all drafts of Exhibit B that the parties exchanged. Thus, APS had time to review the language and ensure that it was comfortable with the pricing terms. Indeed, the December 21, 2010 email from Dominianni to Finch confirms that APS believed its review of Exhibit B was sufficiently complete: not only does the email acknowledge that the $37 per-screening rate was the product of negotiation between the parties, but it includes a specific representation that the rest of the pricing terms were "acceptable to APS." Even so, almost three more months elapsed before the Agreement was actually signed, providing APS with additional time to review the terms of the contract.

In these respects, the case resembles two others in which this Court denied rescission on the grounds of negligence. In *VCG*, the Court observed that the contractual language was clear, that the party claiming mistake was sophisticated, and that there was no claim that "it was limited in its ability to review drafts of the agreement or to discuss the provisions of the [contract] before it was executed." 594 F. Supp. 2d at 344. The Court concluded that the plaintiff had "simply failed to review carefully the terms of the parties' agreement" and held that

---

*Brothers, Inc. v. Piper Jaffray & Co.*, No. 600629/06, 2008 N.Y. Misc. LEXIS 8016, at *34-35 (N.Y. Sup. Ct. May 20, 2008), the New York trial court said that ordinary care was "necessarily a fact-intensive question" but immediately added that the record contained evidence supporting the party's claim that it acted reasonably. Both state and federal courts have disposed of rescission claims on the basis that the party alleging mistake did not exercise ordinary care. *See VCG*, 594 F. Supp. 2d at 344; *NCR Corp. v. Lemelson Med., Educ. and Research Found.*, No. 99 Civ. 3017 (KNF), 2001 WL 1911024, at *7-8 (S.D.N.Y.2001); *Sanford/Kissena Owners Corp. v. Daral Properties, LLC*, 923 N.Y.S.2d 692, 694-95 (N.Y. App. Div. 2011); *Wachovia Sec., LLC v. Joseph*, 866 N.Y.S.2d 651, 653 (N.Y. App. Div. 2008).

such negligence did not warrant rescission.  *Id.*  The reasoning in *NCR Corp.* was almost identical, as was the Court's conclusion that the mistake resulted from a sophisticated entity's failure "to review carefully unambiguous language in the parties' agreement."  *NCR Corp.*, 2001 WL 1911024, at *7.

APS attempts to distinguish these cases on two bases.  First, it argues that the parties seeking rescission in *VCG* and in *NCR* "simply failed to review the terms of the parties' agreement."  Def.'s Reply Mem. of Law in Further Support (Amend) at 12 n.5.  This argument ignores the key qualifier, "carefully," that appears in both opinions.  Thus, to the extent APS's argument implies that ordinary care can be established by merely indicating that the party actually read the contract, the Court rejects that premise.  Second, APS seeks to distinguish the cases on the grounds that "there was no evidence in [*VCG* or *NCR*] that the other party knew of the mistake and intentionally concealed it from the party seeking rescission."  *Id.*  The Court is unable to identify the basis for this purported distinction, as these are two of the cases standing for the very proposition that rescission for unilateral mistake can be based on the "knew or should have known" standard.  If there were no allegation of knowledge in either case, it would be difficult to understand why the Court bothered to undertake the ordinary care analysis (and, in the case of *NCR*, the unconscionability analysis) at all, rather than merely denying rescission for failure to allege one of the requisite elements of the claim.

None of Defendant's arguments regarding ordinary care points to evidence that could raise a triable issue on this point.  The claim that "[a] dictionary would not have informed APS that Summit intended to use the Watson estimates instead of the number of online appointments," *id.* at 11, is inaccurate.  The issue is not whether APS knew what Summit subjectively "intended to use," but rather whether APS exercised ordinary care in determining

40

what the contract required.  As previously discussed, a dictionary would certainly have informed

APS that it was the "Customer" referenced in the Agreement, and it would necessarily follow

that the phrase "Customer projection" refers to a projection received from APS.  Since the

Watson estimates were the only projections APS had been providing to Summit prior to the

execution date of the contract, the "means of knowledge were easily accessible" with respect to

what would form the basis for the minimum fee calculation.

McDonough and Watson offered deposition testimony to the effect that APS had no way

of reliably predicting how many state employees would ultimately attend the Summit clinics.

*See* Decl. of Howard S. Wolfson (Amend) Ex. F, at 90:13-24, 228:6-18; *id.* Ex. G, at 59:21-60:9.

As a result, McDonough testified that APS believed the online appointment system, as of the day

before each clinic, provided the "best estimate of how many people were going to show up." *Id.*

Ex. F, at 142:5-14.  This may very well be so, and it may indeed be the case that the contract

would have better reflected reality if it based the minimum fees on the online appointment

system.  However, while those considerations would have justified APS in seeking to revise the

terms of the contract before it was signed, they do not justify an assumption that the contract said

something that it did not.  To the contrary, a careful reading of the contract would have belied

that very assumption, regardless of its reasonableness in theory.

APS also argues that its mistaken interpretation of the contract was reasonable given "the

fact that the [Agreement] fails to provide any process, procedure or timeline for providing a

Customer projection, other than the number of online appointments made by State employees,

and Summit's failure to request that APS provide it with any 'Customer projections' prior to

41

March 15, 2011."[22]  *Id.* Ex. A, Counterclaim ¶ 75; *see* Def.'s Mem. of Law in Supp. (Amend) at

30.  There does not appear to be any dispute regarding the Agreement's silence on the logistical

points.  If anything, however, this silence merely provides all the more reason for APS to have

paid closer attention to—and to have sought clarification of—the minimum fee provision.  It

does not explain why a contractual provision referring to data provided by APS was instead read

to refer to data not provided by APS.  Likewise, although Summit may not have specifically

requested "Customer projections" using those words, that does not change the fact that the

contract clearly refers to estimates provided by APS.  Thus, one would have expected APS to

attempt to discern what it was they were supposed to provide and whether they were already

providing it, rather than merely assuming that the phrase referred to something they were neither

responsible for nor capable of providing.[23]

      The fact that Summit did not specifically inform APS that Watson's estimates would be

used for billing purposes does not bear on the analysis.  *See* Def.'s Reply Mem. of Law in

Further Supp. (Amend) at 12.  Any reliance by APS on Summit's silence with respect to the

meaning of an unambiguous contract provision cannot reasonably be said to constitute ordinary

care.

      Similarly irrelevant is the fact that Moczul offered Watson a choice between providing

participation estimates or an indication of how much staffing would be required for each clinic.

---

[22] Note that APS is merely observing that Summit did not specifically use the phrase "Customer projections."  APS acknowledges elsewhere in its briefs and supporting papers that Summit did request "participation estimates."  *See* Def.'s Mem. of Law in Opp'n (MSJ) at 8; Decl. of Troy Watson (MSJ) ¶ 5.

[23] This is particularly so given that APS claims that it expected Summit to staff the clinics based on the Watson estimates.  As discussed above, it would be unreasonable to expect Summit to staff based on that set of numbers and then bill based on the online appointments.  In other words, the consequences of APS's mistaken interpretation should have themselves raised a red flag calling for a more careful examination of the language.

APS argues that, since Summit could not have billed based on the staffing figures, Watson's decision to provide participation estimates "was obviously not intended to serve as the 'Customer projection.'"  *Id.*  Once again, however, the relevant inquiry is not whether one of the parties—or one of that party's employees— subjectively "intended" that the Watson estimates be used for billing purposes; it is sufficient that Watson did, in fact, provide participation estimates and that the contract unambiguously authorized Summit to bill APS on that basis.  To put it another way, although the alleged mistake is presented elsewhere in APS's briefs as "a mistake of fact as to what was *going to be* used as the Customer projection," *id.* at 9 (emphasis added), what APS is actually describing is a mistake as to what *could be* used as a Customer projection. It is at that level of contract interpretation that APS failed to exercise ordinary care; had the contract been properly construed pursuant to its unambiguous terms, the mistake would have been self-evident.

Because APS has failed to come forward with evidence tending to demonstrate that it exercised ordinary care in interpreting Exhibit B of the Agreement, the Court finds that the proposed counterclaim would not withstand Plaintiff's motion for summary judgment.  The motion to amend is therefore denied, on the basis of futility, with respect to the counterclaim.

### ii.  Proposed Amendments to the Affirmative Defenses

APS also seeks leave to add factual allegations to five of its affirmative defenses (offsetting breach of contract, breach of the implied covenant of good faith and fair dealing, estoppel, waiver, and failure to mitigate).  Def.'s Mem. of Law in Supp. (Amend) at 5; Decl. of Howard S. Wolfson (Amend) Ex. A, ¶¶ 42-46.  Because those affirmative defenses have already been disposed of via Plaintiff's summary judgment motion, the proposed amendments would be

  
both unnecessary and futile at this stage.[24]  Defendant's motion is therefore denied with respect to the affirmative defenses.

## IV.     Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Defendant's motion for leave to file an amended answer and counterclaim is DENIED.  The Clerk of the Court is respectfully directed to terminate the motions (Docs. 38, 42).

The parties are instructed to file a joint pretrial order in accordance with Rule 3(A) of the undersigned's Individual Practices by **February 26, 2014**, and to appear for a pretrial conference on **March 5, 2014 at 4:00 p.m.**, at which time the Court will set a trial date, a final pretrial conference date, and a schedule for all pretrial filings.

It is SO ORDERED.

Dated:      January 24, 2014
            New York, New York

                                                    Edgardo Ramos, U.S.D.J.

---

[24] The proposed amendment indicates that Defendant's implied covenant of good faith and fair dealing defense is based on the notion that "Summit's actions seek to deprive APS of the fruits of the parties' agreement by forcing APS to pay more than twice the per screening price the parties agreed to."  Decl. of Howard S. Wolfson (Amend) Ex. A, ¶ 43.  APS alleges that Summit breached the implied covenant by billing APS based on estimates that it said would be used for staffing, by disregarding those estimates for staffing purposes, by concealing its own estimates from APS, and by withholding invoices. *Id.*  This theory of breach does not alter the Court's previous determination that the defense fails as a matter of law.  The allegations are largely duplicative of arguments raised elsewhere in Defendant's papers, and they fail for similar reasons.  The Court declines to read the implied covenant so broadly as to impose on one party a duty to explain the contract's plain meaning to its counterparty, or to express an opinion regarding the accuracy of data provided by the counterparty. *See M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties.").  Moreover, as previously discussed, APS has acknowledged that Summit did rely on the Watson estimates in at least some instances.  Finally, as noted in the Court's discussion of estoppel, Summit did not "force" APS to provide erroneously high estimates; the fact that APS's numbers ended up being wrong should not preclude Summit from enforcing its rights pursuant to the unambiguous terms of the contract.