UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APEX EMPLOYEE WELLNESS
SERVICES, INC., as assignee of Summit
Health, Inc.,

Plaintiff,

– against –

APS HEALTHCARE BETHESDA, INC.,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 2/1/2017

**OPINION AND ORDER**

11 CIV. 9718 (ER)

Ramos, D.J.:

Apex Employee Wellness Services, Inc. ("Plaintiff" or "Apex"), as the assignee of

Summit Health, Inc. ("Summit"),[1] brought this breach of contract action against APS Healthcare

Bethesda, Inc. ("Defendant" or "APS"), alleging that APS failed to pay the full amount due

under their service contract.  Doc. 1 ("Compl.").  Trial in this matter concluded on August 1,

2014, with a jury verdict awarding Plaintiff $1,522,176.  Doc. 111.  Judgment in this amount was

entered on August 4, 2014.  Doc. 112.

Plaintiff moves the Court for an order awarding Plaintiff:  (1) prejudgment interest based

on the jury verdict; (2) litigation expenses, including attorneys' fees; (3) interest on the litigation

expenses; and (4) post-judgment interest pursuant to 28 U.S.C. § 1961(a).  Doc. 113.  Defendant

moves for "relief from final judgment pursuant to Federal Rules of Civil Procedure 59(e) and

60(b)(2) and (3)," including for a new trial to the extent necessary.  Doc. 126.

---

[1] Summit assigned all claims against APS relating to this matter to APEX on April 17, 2014 and filed a motion to
substitute APEX as a Plaintiff in this action.  *See* Doc. 114 at 2.  APS did not oppose the motion, and the Court
granted the motion on May 27, 2014.  Doc. 81.

I.     BACKGROUND

   A.  Factual Background

The following facts are undisputed except where otherwise noted and are taken from the parties' previous summary judgment submissions.[2]  Although the parties did not reiterate the majority of the background facts in the instant briefing, the Court includes the factual background as it is relevant to the Court's decision.

Summit is a Michigan corporation that develops healthcare programs for businesses and health plans. Compl. ¶ 3.  Its programs offer preventative care services, including health screenings, at employees' and plan members' worksites.  *Id.*  Its chief executive officer at the relevant time was Richard Pennington, and its chief operating officer was Douglas Finch.  Decl. of Richard Penington (MSJ) ¶ 1; Decl. of Douglas C. Finch (MSJ) ¶ 1.  Jason Moczul, the national account manager assigned to the program at issue in this case, was APS's primary contact at Summit with respect to operational matters.  Decl. of Jason Moczul (MSJ) ¶¶ 1-2.

APS, an Iowa corporation with its principal place of business in White Plains, New York, administers state and local government health plans and provides healthcare services to government employees.  Complaint ("Compl.") (Doc. 1) ¶ 4; Answer (Doc. 7) ¶ 4.  During the time period at issue in this case, its president and chief operating officer was Jerome Vaccaro, its chief financial officer was John McDonough, and the in-house attorney who served as the "point man" in negotiations with Summit was Paul Dominianni.  Decl. of Jeff E. Butler (MSJ) Ex. 27, at 6:5-6, 71:18-72:14; *id.* Ex. 29, at 19:12-15.  David Glazer, a senior vice president in White

---

[2] Following the format the Court adopted in its previous Opinion, background citations to the parties' previous briefs will include parenthetical notations indicating whether a given document relates to Plaintiff's motion for summary judgment ("MSJ") or Defendant's motion for leave to file an amended answer and counterclaim ("Amend").

Plains who was responsible for operations in the eastern United States, oversaw a team of employees based in Tennessee. *Id.*

Ex. 26, at 6:21-7:2, 12:7-12; *id.* Ex. 27, at 10:13-15, 11:3-5. That team included an executive director, Jim Shulman, who reported to Glazer; a director of operations, Bob Hines, who reported to Shulman; and a clinical supervisor, Troy Watson, who reported to Hines. *Id.* Ex. 26, at 11:20-12:12.

Summit and APS were parties to the Summit Health Services Agreement (the "Agreement"), which was effective as of January 1, 2011. Pl.'s 56.1 Stmt. ¶ 3; Def.'s 56.1 Stmt. ¶ 3.[3] The Agreement was a subcontract. APS was also party to a general contract with the State of Tennessee, wherein APS agreed to provide health care services to state employees who had enrolled in the state's "ParTNers for Health" program. Pl.'s 56.1 Stmt. ¶ 12; Def.'s 56.1 Stmt. ¶ 12. This contract paid APS a fixed fee per screening performed, and it exposed APS to liquidated damages based on various performance metrics, including maintenance of a fully operational website. Decl. of Jeff E. Butler (MSJ) Ex. 1, at APS 14994, 15009-15012. Under the Agreement, Summit agreed to provide staffing and supplies for health screening clinics at Tennessee worksites during the first six months of 2011. Pl.'s 56.1 Stmt. ¶ 4; Def.'s 56.1 Stmt. ¶ 4. Summit's contractual duties included registering participants, scheduling appointments, and setting up the clinics. Agreement at 11.[4] Participating state employees could sign up online or by phone in advance of each clinic. *Id.* Summit maintained an online appointment system that state employees could use for this purpose. Pl.'s 56.1 Stmt. ¶ 15; Def.'s 56.1 Stmt. ¶ 15. In

---

[3] Citations to "Pl.'s" 56.1 Stmt." refer to Plaintiff's Local Civil Rule 56.1 Statement, Doc. 47. Citations to "Def.'s 56.1 Stmt." refer to Defendant's Local Civil Rule 56.1 Statement, Doc. 55.

[4] A copy of the Agreement is included as Exhibit 1 to the Declaration of Douglas C. Finch in support of Plaintiff's summary judgment motion. Doc. 40. Citations to the Agreement refer to the original pagination as it appears on the bottom center of each page.

addition, Summit was required to accept "walk-in appointments" to the extent it could accommodate them and subject to an agreed-upon policy.  Agreement at 11.

The pricing terms were set forth in Exhibit B to the Agreement.  *Id.* at 3, 17-20.  The terms included a $37 fee for each screening Summit performed.  *Id.* at 17.  That price was the product of negotiations between the parties.  *See* Decl. of Richard Penington (MSJ) ¶ 10.  Exhibit B also included various fees, including a "standard minimum" for "health screening clinics" that was described as follows: "40 screenings, or 90% of Customer projection, whichever is greater."  Agreement at 17.  This per-clinic minimum fee provision was the subject of the litigation, and was heavily contested on summary judgment and at trial.  The provision appeared in all drafts of Exhibit B that the parties exchanged.  Pl.'s 56.1 Stmt. ¶ 8; Def.'s 56.1 Stmt. ¶ 8.

On December 21, 2010, Dominianni sent Finch an email in which he referenced the parties' earlier agreement to reduce the per-screening rate to $37 and informed Finch that all other provisions of Exhibit B were "acceptable to APS."  Decl. of Douglas C. Finch (MSJ) Ex. 5.  Summit began performing under the Agreement in January 2011, although the Agreement was not actually signed until March 15, 2011.  Pl.'s 56.1 Stmt. ¶¶ 20, 23; Def.'s 56.1 Stmt. ¶¶ 20, 23.  At Summit's request, Watson and his team began providing Summit with clinic-by-clinic participation estimates (the "Watson estimates").  *See* Decl. of Troy Watson (MSJ) ¶¶ 5, 10; *id.* Ex. C.  Glazer testified at his deposition that he knew the Watson estimates were being provided but that he believed they would be used solely for staffing (and not for billing) purposes.  Decl. of Jeff Butler (MSJ) Ex. 26, at 114:19-116:2, 117:2-117:6.  Watson testified that he typically tried to provide an estimate at least two weeks prior to a given clinic.  *Id.* Ex. 30, at 115:20-

116:10.  He expected that Summit would staff and supply the clinics based on those estimates.

*Id.* Ex. 30, at 78:25-79:4, 169:7-9.  Both he and Glazer provided deposition testimony indicating

that Watson's figures represented good-faith estimates of expected clinic participation.  Decl. of

Jeff Butler (MSJ) Ex. 26, at 130:23-131:15, 170:23-171:6; *id.* Ex. 30, at 76:9-15.  However,

Watson repeatedly indicated to Summit that the numbers he was providing were "guesses."  *See*,

*e.g.*, Decl. of Troy Watson (MSJ) Ex. E-F.

The accuracy of the Watson estimates, as that issue pertained to the minimum fee

provision, arose in a January 18, 2011 internal Summit email exchange between Finch and

Moczul.  Decl. of Howard S. Wolfson (MSJ) Ex. P, at SUM 10973-74.  Penington was copied on

the emails.  *Id*  In the process of deciding that Summit would absorb the cost of providing

additional privacy screens, Finch pointed out that "the clinic minimums are attractive (40 and

90%)."  *Id.*  Moczul responded as follows:

> I will go ahead and order another 30 [privacy screens].  That will be awesome to
> get 90%. We may have to talk about a gameplan of ensuring that the APS crew we
> talk to each week is aware of this because I wouldn't want them to be surprised
> with that first invoice.  Just to give you an idea, the average estimate over the first
> two weeks has been 320 and our average screen/clinic is more like 70.

*Id*. Ex. P at SUM 10973.  At his deposition, Moczul testified that he did not recall having any

follow-up discussions about the issues raised in these emails, nor did he recall informing Watson

that the estimates would be used for billing purposes.  *Id.* Ex. D, at 33:7-12, 211:19-212:3.

Penington and Finch similarly could not recall subsequent discussions concerning Moczul's

email.  Decl. of Howard S. Wolfson (Amend) Ex. M, at 207:5-208:23; *id.* Ex. T, at 296:10-17.

Moczul prepared an initial invoice for January 2011 in February of that year, but he informed

Penington and Finch that he would hold off on sending it until the Agreement was signed.  Decl.

of Howard S. Wolfson (MSJ) Ex. R, S.

In early 2011, still prior to the execution of the Agreement, there were a number of performance issues with the online appointment system, including a glitch that allowed a limited number of participants to see other participants' appointments. Decl. of Richard Penington (MSJ) ¶¶ 13-14. To remedy the privacy issue, the system had to be shut down for over two weeks in March. *Id.* ¶ 14. On March 8, Vaccaro alerted Penington to additional complaints about Summit's performance. *Id.* ¶ 15. These complaints included issues with the level of staffing being provided, allegations that staff members were inadequately trained, and reports of equipment malfunctions. *Id.* Also around that time, Summit realized that screening results, which included confidential patient information, were being provided to APS without a Business Associate Agreement ("BAA") in place, exposing Summit to potential HIPPA liability. *Id.* ¶ 16; Decl. of Douglas C. Finch (MSJ) ¶¶ 6, 31-32. Rather than executing a stand-alone BAA, the parties had included the document as Exhibit C to the Agreement, which at that point still remained unsigned. Decl. of Douglas C. Finch (MSJ) ¶ 31; *see* Agreement at 21-30. Summit therefore suspended the electronic data feed that was transmitting the results to APS. Decl. of Douglas C. Finch (MSJ) ¶ 32; Decl. of Richard Penington (MSJ) ¶ 16. APS asked Summit to sign a standalone BAA at that point, but Finch informed APS on March 10 that Summit would only sign the BAA "in conjunction with a signed contract." Decl. of Douglas C. Finch (MSJ) ¶ 33; *id.* Ex. 11. This appears to have accelerated any remaining negotiations, and the Agreement was signed five days later. Finch and McDonough were the signatories for their respective companies. Agreement at 8.

Finch and Glazer met in White Plains on March 17, 2011, two days after the Agreement was signed. Decl. of Douglas C. Finch (MSJ) ¶ 40. It was during this conversation that the

minimum fee issue came to the fore, with Finch informing Glazer that the Watson estimates resulted in large minimum fees for January and February.  *Id.* ¶ 41; Decl. of Jeff E. Butler (MSJ) Ex. 26, at 113:6-116:2.  Glazer emailed Finch on March 18, copying Shulman and Hines.  Decl. of Douglas C. Finch (MSJ) Ex. 16.  In the email, Glazer noted that the Tennessee staff had not been aware of the minimum fee provision because the Agreement "had never been completed in during [sic] those early months."  *Id.*  He then referenced the staffing issues at the clinics, along with weather-related reductions in expected turnout, before writing:

> Given all of these circumstances, we would expect that as a partner in this contract you would be billing us in January for the screenings with a minimum of 40 as a standard.  We would not expect you to invoke the section of the contract that talks about 90% of projections.

> I have instructed the local TN team to review their projections immediately and revise the way they calculate these and to inform you today on new estimates for each site so that you can have an accurate estimate of how you should staff these screenings.

*Id.*  Hines sent Finch a follow-up email later that day, copying Glazer and Shulman (the "Hines email"). The Hines email read:

> We just reviewed David Glazer's email regarding the methodology for determining screener staffing. It appears that you have been basing your staffing on the number of folks that are signing up (and the number of slots) on your registration sheet. You sent a staffing sheet to [Watson] this month for his review and approval. We would suggest that you continue that method of review (relying on sign-ups on the registration sheets) along with the monthly review with [Watson].

> [Glazer] is correct in his assessment that we all shot high back in December. We realized during January that the sites were not being fully utilized.  We adjusted as did you, considering the amount of staff you have been sending to each site since mid January.  Once the screenings were well under way, it was clear that neither one of us was using December "estimates".  Although it is sometimes difficult to predict how many folks may be necessary (an example being this morning's back-ups), we believe that using the sign-up sheets as a guide is the best way to determine how many screeners you need.  It looks like you have been doing that all along anyway.  If you are still using any of the estimates, you should, effective immediately, stop and continue to utilize the sign up sheets (along with [Watson]'s review) as your guide.

*Id.* Ex. 17.

As the program progressed, Summit continued to request participation estimates from Watson and his team, indicating that additional clinics could not be added to APEX without that data.  *See* Decl. of Howard S. Wolfson (MSJ) Ex. PP.  Watson thus began providing uniform estimates of either 75 or, if the clinic was being held in a large city, 100. Decl. of Troy Watson (MSJ) ¶ 21; *see* Decl. of Jeff Butler (MSJ) Ex. 21, at APS 9186.

Summit sent APS its first invoice, covering the screenings performed in January, on March 30, 2011.  Pl.'s 56.1 Stmt. ¶ 24; Def.'s 56.1 Stmt. ¶ 24.  In the cover email accompanying that invoice, Finch described some "accommodations" that Summit made in light of APS's concerns.  Decl. of Douglas C. Finch (MSJ) Ex. 24.  The "accommodations" included an "Alternative Minimum Calculation" whereby minimum fees were calculated based on an estimate of actual screening capacity rather than on the Watson estimates.  *Id.*  The February invoice was similarly discounted based on the "Alternative Minimum Calculation."  *Id.* ¶ 48; *see* Decl. of John McDonough (MSJ) Ex. F.  APS ultimately received six invoices, one for each month of the program. Decl. of Douglas C. Finch (MSJ) Ex. 18-23.

### B.  Procedural Background

Plaintiff filed the instant action for breach of contract on December 30, 2011, alleging that APS owed Plaintiff $2,248,520.88 in damages attributable to the unpaid balance of the invoices.  Compl. ¶¶ 35-36.  Defendant filed an Answer on March 1, 2012, asserting eight affirmative defenses.  Doc. 7.  The parties engaged in extensive discovery from April 2012 to

January 2013.  *See* Doc. 130 at 2.  During this period, the parties took a total of 13 depositions, including the deposition of Douglas Finch.  *Id.* (citing Doc. 131, Butler Decl. Ex. 2).

Plaintiff moved for summary judgment on March 15, 2013, asserting that there were no material issues of fact regarding whether APS breached the HSA by refusing to pay the full amount of the invoices submitted by Summit.  Doc. 38.  On January 24, 2014, the Court granted in part and denied in part Plaintiff's motion, holding that Plaintiff was entitled to summary judgment with respect to the first 150 screening clinics.  Doc. 61 (the "January 24, 2014 Opinion.").  With respect to the remaining clinics, the Court denied summary judgment based on ambiguity in the contract because there were "lingering questions of fact as to whether APS breached the contract, and, if so, the extent of the damages to which Summit is entitled."  *Id.* at 34.  Specifically, the Court held there were triable issues of material fact remaining with respect to two questions:  (1) whether Section (g)(4) of the Agreement precludes Summit from charging minimum fees subsequent to the first 150 clinics; and (2) what "Customer projection," if any, APS provided for clinics held after March 18, 2011.  *Id.*  The Court rejected all of APS's affirmative defenses, including those based on equitable estoppel and the implied covenant of good faith and fair dealing.  *Id.* at 28, 31.

The remaining issues were resolved in a jury trial that took place from July 28 to August 1, 2014.  The jury found that Plaintiff was entitled to bill APS for standard minimum fees after the 150th clinic and awarded judgment for the total amount of minimum fees owed by APS to Summit in the amount of $1,522,176.  Doc. 111.  The jury also found that Summit did not prove by a preponderance of the evidence that it was entitled to use the estimates provided by Troy

Watson and his team for purposes of calculating minimum fees for clinics held after March 18, 2011.  *Id.*  Judgment in this amount was entered against Defendant on August 4, 2014.  Doc. 112.

## II.      JURISDICTION TO CONSIDER THE INSTANT MOTIONS

While Plaintiff's Motion for Attorneys' Fees was pending, Defendant filed a Notice of Appeal on August 27, 2014.  Doc. 125.  Defendant then filed its Motion for Relief from Final Judgment with this Court on September 2, 2014.  Doc. 126.[5]  The appeal is currently pending in the Second Circuit Court of Appeals.  *See* Doc. 150.  The Court must consider the jurisdictional implications of that appeal before adjudicating the pending motions.

"The filing of a notice of appeal is an event of jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  However, the filing of an appeal "only divest[s] the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal."  *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989).

First, as to Plaintiff's Motion for Attorneys' Fees, Nontaxable Expenses, and Interest, "notwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters, including claims for attorneys' fees."  *Tancredi v. Metro, Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004); *see also White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 452 n.14 (1982) (discussing "collateral character of [attorney's fee] issue[s]").  Accordingly, this Court retains jurisdiction over claims concerning attorneys' fees and interest while a merits determination is pending on appeal.

---

[5] A party can file a Rule 60(b) motion "even though an appeal has been taken and is pending."  *King v. First Am. Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir. 2002) (internal quotation marks and citation omitted).

Second, as to Defendant's Motion for Relief from Final Judgment, generally, a district court may entertain and deny a Rule 60(b) motion during the pendency of an appeal, but "may *grant* a [R]ule 60(b) motion after an appeal is taken only if the moving party obtains permission from the circuit court." *Toliver v. County of Sullivan*, 957 F.2d 47, 49 (2d Cir. 1992) (emphasis in original); *accord King v. First Am. Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir. 2002). In this regard, the Second Circuit has emphasized that "if [the district court] decides in favor of [the Rule 60(b) motion], then and then only is the necessary remand by the court of appeals to be sought." *Toliver*, 957 F.2d at 49 (internal quotation marks and citation omitted). Additionally, where a notice of appeal is filed while a timely filed Rule 59(e) motion is pending, "the trial court retains jurisdiction over the post-judgment motion..." *Basciano v. Lindsay*, No. 07 Civ. 421 (NGG), 2008 WL 1700442, at *1 (E.D.N.Y. Apr. 9, 2008), *aff'd sub nom. Basciano v. Martinez*, 316 F. App'x 50 (2d Cir. 2009).

As explained more fully below, because this Court denies Defendant's Motion for Relief from Final Judgment, it may properly do so without disrupting the Court of Appeals' jurisdiction and without first obtaining permission from the Second Circuit. *See Toliver*, 957 F.2d at 49.

## III.   LEGAL STANDARDS AND RELATIONSHIP BETWEEN RULES 59(e) AND 60(b)

The Federal Rules of Civil Procedure allow a litigant subject to an adverse judgment to file either a motion to alter or amend the judgment pursuant to Rule 59(e) or a motion seeking relief from the judgment pursuant to Rule 60(b). "Although the two rules appear similar, they are in fact quite distinct." *Robinson v. Wix Filtration Corp*. LLC, 599 F.3d 403, 411 (4th Cir. 2010). Rule 59(e) is "a device to relitigate the original issue decided by the district court, and [it is] used to allege legal error." *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003). The moving party must show one of the following to prevail on a Rule 59(e) motion: (1) an

intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). "Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances including fraud, mistake, and newly discovered evidence." *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005).

Defendant's motion invokes both Rule 59(e) and Rule 60(b). The version of Rule 59(e) that was in effect at the time of Defendant's judgment contains a 28-day time-limit on filing motions under Rule 59(e). Fed. R. Civ. P. 59(e).[6] The deadline under Rule 59(e) is "inflexible." *Crenshaw v. Superintendent of Five Points Corr. Fac.*, 595 F. Supp. 2d 224, 227 (W.D.N.Y. 2009). However, a motion under Rule 60(b) "must be made within a reasonable time…no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60.

Here, it is unclear which judgment that Defendant seeks to "alter or amend" under Rule 59(e). Defendant confusingly states it seeks "relief from the portion of the Court's August 4, 2014 Judgment in favor of plaintiff … that applied the January 24, 2014 Opinion and Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment." Doc. 127 at 1. Under the twenty eight day rule, a Rule 59(e) motion related to the January 24 Opinion needed to be filed by late February 2014, and Defendant did not file the instant motion until September 2, 2014. So to the extent Defendant seeks to amend the January 24 Opinion, its motion under Rule 59(e) is untimely. However, a 59(e) motion related to the entry of final judgment dated August

---

[6] Prior to December 1, 2009, motions under Rule 59(e) were required to be filed no later than 10 days after the entry of judgment.

4, 2014 was required to be filed by September 2, 2014, and therefore the 59(e) motion in relation

to that decision was timely filed.[7]  Additionally, the filing falls within the "reasonable time" limit

provided in Rule 60.

Nonetheless, where a party requests relief under both Rule 60 and Rule 59(e) and the

Rule 59(e) request "merely replicates [the] request under Rule 60(b), and any relief which

plaintiffs seek under Rule 59(e) is covered by Rule 60(b), the Court will not separately analyze

Rule 59(e)."  *Cueto v. Tucker*, No. 12 Civ. 4016 (PAE), 2012 WL 4466632, at n.1 (S.D.N.Y.

Sept. 27, 2012); *see also Twumasi v. Brennan Trans*., No. 94 Civ. 5930 (DLC), 1996 WL

343056, at n.2 (S.D.N.Y. June 20, 1996) *aff'd*, 129 F.3d 114 (2d Cir. 1997) ("Although

substantive differences do exist between the rules, in the instant case plaintiff's request for relief

under Rule 59(e) merely replicates his request under Rule 60(b).  Therefore, because Rule 60(b)

addresses the situation presented by this motion, and any relief to which plaintiff is arguably

entitled under Rule 59(e) is covered by Rule 60(b), the Court will not separately analyze

plaintiff's motion under Rule 59(e).").[8]

Rule 60(b) provides, in relevant part, that "the court may relieve a party . . . from a final

judgment, order or proceeding for . . . reasons [of]: . . .  (2) newly discovered evidence, that, with

reasonable diligence, could not have been discovered in time to move for a new trial under Rule

59(B); [and] (3) fraud . . . misrepresentation, or misconduct by an opposing party…"  Fed. R.

Civ. P. 60(b).  Here, Defendant seeks relief under both 60(b)(2) and 60(b)(3).

---

[7] September 1, 2014 was a Federal Holiday (Labor Day), so the deadline was extended.

[8] Here, the relief requested, including a new trial, is covered by both Rule 59(e) and 60(b).  *See, e.g., Strobl v. N.Y. Mercantile Exch.,* 590 F. Supp. 875, 878 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985) ("[D]efendants' motion for a new trial based on newly discovered evidence is premised on both Fed. R. Civ. P. 59 and 60(b).  Each of these rules provides a different time within which the motion must be made.  However, the substantive standards under both rules are essentially identical.").

Rule 60(b) "allows extraordinary judicial relief."  *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (citation omitted).  "A [Rule 60(b)] motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances."  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001).  "In deciding a Rule 60(b) motion, a court must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality."  *Kotlicky v. United States Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir.1987) (citation omitted).  Moreover, Rule 60(b) motions are left to the sound discretion of the district judge.  *See Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir. 1991).  The burden of proof is on the party seeking relief from the judgment. *Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004).

## IV.   MOTION TO SET ASIDE THE JUDGMENT UNDER RULE 60(B)

Defendant seeks relief from this Court's granting in part of summary judgment under both Rules 60(b)(2) and 60(b)(3) of the Federal Rules of Civil Procedure.

### A.  Rule 60(b)(2) Relief is Not Appropriate

Rule 60(b)(2) contemplates "newly discovered evidence which by due diligence could not have been discovered in time" for the disposition at issue.  Fed. R. Civ. P. 60(b)(2).  A movant seeking relief under Rule 60(b)(2), must meet an "onerous standard" by showing that: (1) the newly discovered evidence is of facts that existed at the time of trial or other dispositive proceeding; (2) the moving party is justifiably ignorant of the facts despite using due diligence to learn about them; (3) the newly discovered evidence is admissible and of such importance that it probably would have changed the outcome; and (4) the newly discovered evidence is not merely cumulative or impeaching.  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).  These requirements must be "strictly met."  *United States v. All Right, Title and Interest*

14

*in Property and Premises Known as 710 Main Street, Peekskill, N.Y.*, 753 F. Supp. 121, 126 (S.D.N.Y. 1990).  Moreover, the newly discovered evidence must be "highly convincing." *Kotlicky*, 817 F.2d at 9.

The Court finds that Defendant has failed to meet this standard because it has not shown that it was diligent in seeking out this evidence or that the evidence is of such importance that it probably would have changed the outcome of the case.

### i.   APS Did Not Use Due Diligence to Learn About the "Newly Discovered" Evidence

Defendant's core argument is that the trial testimony of Douglas Finch, Summit's Chief Operating Officer, revealed that Summit lied about the fact that the "principal purpose" of the customer projections was to allow Summit to bill based on them and that Summit misrepresented that the estimates were required for staffing.  Doc. 127 at 1-3.  Based on this allegedly newly discovered evidence, Defendant seeks to reinstate its equitable estoppel and covenant of good faith and fear dealing defenses.  Doc. 127 at 4-5.[9]  Defendant points to the following trial testimony of Mr. Finch as support for its motion:

> Q: So the projection is really there to help staffing and other things, but staffing is one of the principal reasons, correct?
>
> A: It's one of several reasons.
>
> Q: Is it a principal reason?
>
> A: No, the principal reason is for billing.

*Id.* (citing Trial Tr. at 409:3-8).

---

[9] Defendant claims that without the newly discovered evidence, the arguments it advanced at the summary judgment stage regarding the affirmative defenses of equitable estoppel and breach of the covenant of good faith and dealing were limited and the Court's January 24 Order could not take into consideration these facts before ruling that Defendant's affirmative defenses did not apply as a matter of law.  Doc. 127 at 4-5.

Specifically, Defendant claims that throughout the proceedings Mr. Finch "obfuscated the truth" because at his previous deposition he testified that the estimates were used for "multiple purposes" and Plaintiff cannot point to a single instance in which Summit disclosed "that the **principal purpose** of the estimates was so that Summit could bill APS based on them." Doc. 136 at 2 (emphasis in original).

Defendant fails to satisfy the 60(b)(2) standard because it has failed to establish that it was justifiably ignorant of the existence of this evidence despite the exercise of due diligence. APS could have learned of Mr. Finch's opinion about whether billing was the "principal purpose" during his deposition. Mr. Finch was noticed for a deposition during fact discovery and his deposition took place on December 20, 2012. Doc. 131 Ex. 2. Mr. Finch's deposition testimony addressed the multiple purposes for which Summit requested customer projects:

> Q: During December of 2010 did you have any discussion with Mr. Moczul about whether Summit intended to use estimates that had been received from Mr. Watson as a customer projection for purposes of billing APS?
>
> A: Not a specific conversation. Other than any estimates that are provided are used for setting up -- **they are used for multiple purposes**, setting up the clinic, **staffing**, supplies and **billing**, that's the same estimates used across the board.

Doc. 131, Butler Decl. Ex. 2 at 176-77 (emphasis added). However, it is of no consequence that Mr. Finch did not testify during his deposition that the "principal purpose" of the customer projections was so that Summit could bill APS based on those projects. This is of no consequence because Defendants do not point to an instance where Mr. Finch was actually asked in his deposition what the "principal purpose" of the projections were.[10]

---

[10] The Court does not have the entire deposition of Mr. Finch before it, only a small excerpt that Plaintiff provided to suggest that Mr. Finch's trial testimony was indeed not contradictory to his deposition testimony and the additional excerpts provided during the summary judgment briefing. *See* Doc. 44, Ex. 13; Doc. 56, Ex. 1. Tellingly, Defendant fails to point to any specific contradictory testimony, but instead simply states that "[i]n its depositions, declarations, and other sworn statements submitted in this action, Summit compounded its initial misrepresentation by repeating that the customer projections were requested for, and used to, staff the clinics." Doc. 127 at 1-2. Mr.

Additionally, there is no indication his trial testimony contradicts what came before.[11]  At

trial, Mr. Finch did not testify that the customer projections were not *also* necessary for staffing,

only that billing was the "principal purpose."  At his deposition, Mr. Finch listed the various

purposes for which the projections were used; he did not discuss or rank the relative importance

of those different uses because he was not asked to do so.[12]  Thus, the trial evidence is not

inconsistent with the other evidence, including Mr. Finch's previous sworn statements.

Therefore, there is "no indication that [Defendant] could not have discovered this evidence

earlier" through reasonable diligence in posing the same questions during the deposition of Mr.

Finch.  *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) (holding that district

court did not abuse its discretion in denying Rule 60(b)(2) motion where evidence could have

been discovered earlier); *see also Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919

(8th Cir. 1998) (newly discovered evidence in another trial against the insured did not entitle it to

relief from the judgment, since the insured failed to show why that evidence could not have been

discovered earlier with due diligence); *see also QEP Energy Co. v. Sullivan*, 526 F. App'x 828,

830 (10th Cir. 2013) (district court did not abuse its discretion in concluding party did not

exercise reasonable diligence where it sought to vacate judgment based on depositions that party

discovered from another litigation where the party made decision not to depose witnesses in

current litigation); *see also Kirkland v. City of Peekskill Police Dep't*, No. 87 CIV. 8112 (MEL),

Finch's trial testimony does not contradict that the projections were used to staff the clinics, as he stated at trial that staffing was "one of several reasons" for the projections, just not the "principal reason."  *See* Trial Tr. at 409:3-8.

[11] Even assuming his trial testimony was contradicted by other non-testimonial evidence, that in no way excuses Plaintiff's failure to inquire into this topic at Mr. Finch's deposition.  As Defendant properly points out, this supposedly contradictory evidence did not deter counsel from asking the relevant questions at trial.

[12] Additionally, the Court notes that whether Summit or Mr. Finch's subjective view as to which purpose for the estimates was the "primary purpose" is irrelevant given that the contract unambiguously allowed Summit to bill based on the estimates.  That is, Summit could use the estimates to bill under the clear terms of the agreement regardless of what their "primary purpose" was.  In other words, it is sufficient that billing was *a* purpose.

1989 WL 31644, at *3 (S.D.N.Y. Mar. 28, 1989), *aff'd sub nom. Kirkland v. City of Peekskill*, 888 F.2d 125 (2d Cir. 1989) (denying 60(b) relief in relation to newly discovered testimonial evidence because "[t]he fact that the recent testimony of [two witnesses] contradicted that of one another or of other witnesses, and thus may provide a basis to impeach credibility, is not a ground for Rule 60(b) relief.").

If the standard for under Rule 60(b)(2) simply required that a question be asked at trial that has not previously been asked before in a deposition—as Defendant essentially suggests with its motion—the Rule would encourage parties to take incomplete depositions in the hopes of "discovering" new information at trial.[13]  Defendant is effectively seeking to fault Mr. Finch for not *volunteering* this additional information at his deposition, despite the fact he was not specifically questioned about it.

Additionally, although it does not form the primary basis of Defendant's motion, Defendant also references the trial testimony of Jason Moczul, Summit's national account manager assigned to the program to further suggest that Mr. Finch lied.  The testimony relates to a trial exhibit in which Mr. Finch wrote to APS's senior management that "Summit believes those clinics were appropriately staffed based on Summit Health staffing guidelines."  APS Trial Ex. CR, Doc. 128, Rosenbaum Decl., Ex. 2.  Mr. Moczul testified that he actually wrote that sentence in the email and that the statement was "false" because the company "did not have staffing guidelines."  Trial Tr. 218:6-8, Doc. 128, Rosenbaum Decl., Ex. 1.  For the same reasons as discussed above, there is no indication that Defendant could not have discovered this

---

[13] *See also Schlicht v. United States*, No. Civ. 03-1606 (RCB), 2006 WL 229551, at *2 (D. Ariz. Jan. 30, 2006) (Rule 60(b)(2) "was not intended to reward the lackadaisical or unscrupulous litigant who fails to make a timely offer of evidence.  Otherwise, Rule 60(b) would be relegated to a tool of litigation gamesmanship by which parties could withhold evidence from the courts, emboldened with the knowledge that they would have a second bite at the apple on account of their "newly disclosed evidence.").

testimony regarding whether the statement was false earlier through reasonable diligence.  There is no allegation that the exhibit itself, Trial Ex. CR, was newly discovered.

### i.    The "New Evidence" Would Not Have Altered the Outcome in this Case

Even if Defendant acted diligently in seeking out the evidence presented at trial, Defendant has also failed to establish that this "newly discovered" evidence would have probably changed the outcome in this case.  Defendant claims that these two additional pieces of trial testimony are relevant to the affirmative defenses of collateral estoppel and breach of the implied covenant of good faith and fair dealing.

First, with respect to the affirmative defense of estoppel, the Court found in its January 24 Opinion that "even assuming that Summit did engage in concealment or misrepresentation" and APS relied to its detriment by providing estimates, "the detriment arose only because APS provided what proved to be erroneously *high* estimates, and the Agreement's minimum fee provision clearly allocated that risk to APS."  Doc. 61 at 32.  Thus, the Court found, *inter alia*, that Defendant had not shown that APS detrimentally relied on any misrepresentation or concealment because the detriment to Defendant was suffered because its projections were *high*, not because the projections were provided in the first place.  *Id.* Therefore, the Court agrees with Plaintiff's argument that even if Mr. Finch's or Mr. Moczul's testimony could be considered evidence that altered the Court's finding regarding whether concealment or misrepresentation occurred, the testimony does not alter the Court's decision on the affirmative defense of estoppel because this evidence does not bear on the element of detrimental reliance.

Similarly, in regards to the breach of the implied covenant of good faith and fair dealing, the Court previously rejected this defense as a matter of law "absent evidence of any cognizable damages sustained by APS as a result of a breach by Summit."  Doc. 61 at 28.  The purported

new testimony does not provide any additional evidence of damages, so the testimony does not change the Court's ruling with regards to this affirmative defense.

Additionally, Defendant points to a number of cases holding that under New York law, a party is required to tell the "full truth" after undertaking to speak.  *See* Doc. 127 at 9-10; Doc. 136 at 5-7.  The basis of Defendant's argument is that had Summit told "the whole truth" that the "principal purpose" of the customer estimates was billing, "APS would not have assumed the risk of providing *any* estimates." Doc. 136 at 7 (emphasis in original).  This ignores, however, the Court's finding that the detriment to Defendant was suffered because the projections were *high*, not because the projections were provided at all.  On this point, the Court reiterates the concerns with Defendant's similar argument that it noted in its January 24 Opinion:

> Here again the Court finds itself confronted with a troubling suggestion…—namely, that APS was somehow tricked into providing artificially high estimates because it did not realize it would be billed accordingly, thus implying that APS would have provided reduced estimates had it known it was in its best financial interest to do so.  Stated another way, implicit in APS's argument is that it willfully provided inflated estimates of employee participation because it believed it would suffer no financial penalty if it caused Summit to overstaff the clinics.  Given that APS's position, putting aside what it now alleges actually transpired, is that Watson and his team had been operating under the assumption that Summit was actually staffing, and thus incurring costs, based on the Watson estimates, it is difficult to see where the alleged 'injustice' lies….One would hope—and the Court will presume—that APS and its employees would have made good-faith estimates regardless of which party was expected to bear the resultant costs.  Moreover…both Glazer and Watson testified at their depositions that the Watson estimates did represent good-faith estimates of expected participation.

Doc. 61 at 32 n.16.  For these reasons, the additional evidence does not alter the outcome in this case.

Thus, because Defendant has not satisfied each of the elements necessary to obtain relief from judgment, the Court finds that this case does not present circumstances warranting the relief sought under Rule 60(b)(2).

### b.  Rule 60(b)(3) Relief is Not Appropriate

Defendant also argues that the Court should vacate the judgment under Rule 60(b)(3) based on Plaintiff's failure to fully disclose Mr. Finch's belief that staffing was not a principal reason Summit sought the participation estimates and Mr. Moczul's trial admission that he March 12, 2011 email contained a false statement regarding staffing guidelines.  A court may grant relief from final judgment under Rule 60(b)(3) in case of "fraud ... misrepresentation, or other misconduct of an adverse party."  Fed. R. Civ. P. 60(b)(3).  Rule 60(b)(3) is "invoked where material information has been withheld or incorrect or perjured evidence has been intentionally supplied."  *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981).  A party must demonstrate that the opponent's misconduct substantially interfered with his ability to fully and fairly prepare his case and defend the motion.  *See Fleming v. N.Y. Univ.*, 865 F.2d 478, 484-485 (2d Cir. 1989); *see also Travelers Cas. & Sur. Co. v. Crow & Sutton Assocs.*, 228 F.R.D. 125, 131 (N.D.N.Y. 2005), *aff'd sub nom. Travelers Cas. & Sur. Co. v. Crow & Sutton Assocs., Inc.*, 172 F. App'x 382 (2d Cir. 2006).  It is well established that "a Rule 60(b)(3) motion cannot be granted absent clear and convincing evidence of material misrepresentations and cannot serve as an attempt to relitigate the merits."  *Fleming*, 865 F.2d at 484.

Here, both parties had access to the March 12, 2011 email to APS management regarding staffing and the ability to depose Mr. Finch and Mr. Moczul.  Where a movant has access to documents and depositions but fails to ask the same relevant questions in a deposition as it does at trial, it cannot credibly claim that it was prevented from "fully presenting its case."  *See Progressive Casualty Ins. Co. v. Liberty Mutual Ins. Co.*, 1996 WL 524339, at *2 (S.D.N.Y. Sept.13, 1996) (holding 60(b)(3) relief inappropriate where documents were in possession of party at the time summary judgment was filed); *see also Taylor v. Texgas Corp.*, 831 F.2d 255,

259-60 (11th Cir. 1987) (where party alleges witness was "less than truthful" at a hearing where he "failed to tell the Court" relevant information, but the questions asked at the hearing did not address certain topics, the defendant cannot establish that the plaintiff's failure to reveal that same information prevented it from fully and fairly presenting its case). Even assuming a misrepresentation or fraud occurred, there still would not be grounds for Rule 60(b)(3) since Defendant has not shown how Plaintiff prevented Defendant from presenting those facts to the Court or representing the case. *See In re Shen*, 501 B.R. 216, 223 (Bankr. S.D.N.Y. 2013) ("Even assuming that the Debtor knew that Bank of America's mortgage should have been satisfied by the refinancing and knew that MERS had issued a satisfaction of the mortgage, and even if the Debtor failed to disclose those facts to the Court, there still would not be grounds for Rule 60(b)(3) relief since EverBank has not alleged how the Debtor prevented EverBank from presenting those facts to the Court in opposition to the [Motion].").

Thus, Defendant has failed to meet its burden to show that the conduct complained of prevented it from fully and fairly presenting its case. Defendant's arguments regarding allegedly false statements or misrepresentations are merely attempts to relitigate this Court's previous summary judgment motion. For these reasons, Defendants cannot prevail as a matter of law on a Rule 60(b)(3) motion predicated on fraud or misrepresentation.

## V.   PLAINTIFFS' MOTION FOR PREJUDGMENT INTEREST, ATTORNEYS' FEES, AND POST-JUDGMENT INTEREST

Plaintiff's motion seeks three forms of relief: (1) prejudgment interest at the statutory rate of nine percent per annum; (2) all reasonable expenses of litigation based on the Services Agreement between Summit and APS, including attorneys' fees, as well as interest on those expenses at the statutory rate; and (3) post-judgment interest on each money judgment entered in this matter. Doc. 114 at 2. Defendant does not dispute that Plaintiff is entitled to (1) pre-

judgment interest at the state statutory rate of 9% per annum, (2) interest on litigation expenses at the state statutory rate of 9% per annum or (3) post-judgment interest at the federal statutory rate of 0.12% per annum.[14]  Thus, the only issues in dispute are whether Plaintiff is entitled to reasonable litigation expenses, including attorneys' fees, and, if so, whether the requested expenses are reasonable.  *Id.*

### a. Prejudgment Interest Under New York Law

Plaintiff seeks an award of prejudgment interest under New York law.  "In a diversity case, state law governs the award of prejudgment interest."  *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008).  Under New York law, in an action at law for breach of contract, "prejudgment interest is recoverable as of right."  *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir. 1993).  New York's prejudgment interest rate for breach of contract cases is 9% per annum, which accrues on a simple, rather than a compound, basis.  *See* N.Y. CPLR § 5004; *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998) ("New York courts have held that in a breach of contract action of this sort prejudgment interest must be calculated on a simple interest basis at the statutory rate of nine percent.") (citations omitted).

Defendant neither disputes that Plaintiff is entitled pre-judgment interest at the state statutory rate of 9% per annum or the amount of prejudgment interest calculated by Plaintiff, totaling $435,574.  *See* Doc. 114 at 4.[15]  Accordingly, the Court awards Plaintiff $435,574 in prejudgment interest.

---

[14] Indeed, Defendant's opposition is entirely silent on the issue of interest.  *See* Doc. 134.

[15] Absent any objection by Defendant, the Court accepts the calculation method outlined by Plaintiffs for determining the various dates of accrual of damages and total interest calculations, which takes into consideration the unpaid minimum fees from each invoice, the date the invoices were paid, the interest due per day, and the total number of days accruing interest for each invoice owed.  *See* Doc. 114 at 4; *see also* Doc. 116, Butler Decl. Ex. 14 (chart of interest on unpaid minimum fees).

23

### b. Attorneys' Fees, Nontaxable Expenses, and Interest On Those Expenses Under the Services Agreement

The Second Circuit has outlined the options a district court has regarding a motion for fees when an appeal on the merits is pending—the district court may:  (1) "rule on the claim for fees;" (2) "defer its ruling on the motion;" or (3) "deny the motion without prejudice, directing…a new period for filing after the appeal has been resolved."  *Tancredi*, 378 F.3d at 225–26 (citing Fed. R. Civ. P. 54(d) advisory committee's note).  Thus, a district court is not required to resolve the motion for attorneys' fees before the appeal is completed.  Indeed, Courts in this Circuit regularly defer the award of attorneys' fees or deny the motion without prejudice pending the resolution of an appeal on the merits.  *See, e.g., Gill v. Bausch & Lomb Supplemental Ret. Income Plan I*, 6:09–Civ–6043 (MAT), 2014 WL 1404902, at *1 (W.D.N.Y. Apr. 10, 2014) ("Where the losing party takes an appeal on the merits of case, the district court has the discretion to defer ruling on the prevailing party's motion for attorney's fees") (citation omitted); *Doe ex rel. Doe v. E. Lyme Bd. of Educ.*, No. 3:11 CV 291 (JBA), 2014 WL 4370504, at *3 (D. Conn. Sept. 2, 2014) (denying motion for attorney's fees and costs "without prejudice to renew such motion…").  Deferring a ruling on Plaintiff's motion for attorneys' fees until the Second Circuit resolves Defendant's appeal ensures that this Court only has to address the motion for attorneys' fees by the party that ultimately prevails.  *See Gill*, 2014 WL 1404902, at *1.  Thus, the Court finds that delaying the resolution of the attorneys' fees issue until the appeal on the merits has been decided is the most prudent course of action because "immediate resolution of the…issue of…attorneys['] fees is unlikely to assist the Court of Appeals."  *Id.* (citation omitted); *see also Matsumura v. Benihana Nat. Corp*., No. 06 CIV. 7609 (NRB), 2014 WL 1553638, at *6 (S.D.N.Y. Apr. 17, 2014), appeal withdrawn (Aug. 1, 2014) (noting that deferral of award of attorneys' fees "does not prevent the merits judgment we have rendered

from being considered final for purposes of appeal").  Accordingly, the Court finds that ruling on the issue of attorneys' fees, expenses, and interest on those expenses is deferred pending the appeal in the Second Circuit.[16]

### c.  Post-Judgment Interest Under Federal Law

Plaintiff seeks an award of post-judgment interest under 28 U.S.C. § 1961(a), which states that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment."  28 U.S.C.A. § 1961.  Post-judgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment.  *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36, (1990).  The Second Circuit has consistently held that an award of post-judgment interest at the statutory rate is "mandatory."  *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) (citing *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004)).

Plaintiff correctly requests that the post-judgment interest run from the date the judgment was entered and Defendant does not dispute that the post-judgment interest is proper or that the appropriate interest rate for this judgment as set by the Treasury is ".12 percent per annum."  *See* Doc. 114 at 7.  Therefore, Plaintiff is awarded post-judgment interest of .12 percent on that judgment for each day that payment is delayed.

---

[16] This deferral does not prevent the merits judgment from being considered final for purposes of appeal.  *See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs*, 134 S. Ct. 773, 777 (2014).

## VI.    CONCLUSION

For the reasons set forth above, Defendant's Motion pursuant to Rule 59(e) and Rule 60(b) is DENIED.  Plaintiff's motion for fees and interest is GRANTED in part and DEFERRED in part.  Specifically, Plaintiff's motion is GRANTED with respect to their request for prejudgment interest and post-judgment interest.  It is hereby:

ORDERED that Plaintiff is awarded prejudgment interest at 9 percent per annum against Defendant and that the previously-entered judgment shall be amended to include prejudgment interest in the amount of $435,574.  The Clerk of the Court is directed to enter an amended judgment for Plaintiff against Defendant for damages and prejudgment interest in the amount of the $1,522,176 awarded in the judgment (Doc. 112), plus the $435,574 in prejudgment interest ordered here, for a total of $1,957,750; and it is further

ORDERED that Plaintiff is awarded post-judgment interest on the August 4, 2014 judgment (Doc. 112) at .12 percent per annum against Defendant.

Plaintiff's motion with respect to attorneys' fees, nontaxable expenses, and interest on the litigation expenses is DEFERRED pending appeal.

The Clerk of the Court is respectfully directed to terminate the motions, Doc. 113, Doc. 126.

It is SO ORDERED.


Dated:         February 1, 2017
               New York, New York


                                              _____
                                              Edgardo Ramos, U.S.D.J

26